## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

| | |
|---|---|
| Alaa E. Elkharwily, M.D., | Court File No.: 0:12-CV-03062 (DSK/JJK) |
| Plaintiff, | |
| v. | AMENDED **COMPLAINT** |
| Mayo Holding Co., a corporation, d/b/a/ Mayo Health System, d/b/a/ Mayo Clinic Health System d/b/a Albert Lea Medical Center - Mayo Health System, Mayo Clinic Health System- Albert Lea, a corporation, Mayo Clinic, Inc., Mayo Foundation, Mark Ciota, M.D., John Grzybowski, M.D., Dieter Heinz, M.D., Robert E. Nesse, M.D., Steve Underdahl, and Stephen Waldhoff, | |
| | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff for his Complaint against Defendants states and alleges as follows:

**PURPOSE OF ACTION**

1.      This action is brought to remedy the retaliation visited on Plaintiff by  Defendants because Plaintiff reported and complained about illegal acts and medical treatment not conforming to recognized standards of medical care by medical personnel at Mayo Clinic Health System – Albert Lea, including discharging Plaintiff from his hospitalist position,  cancelling his research position at Mayo Clinic Rochester, intentionally causing Plaintiff emotional distress, evicting Plaintiff from his housing, and damaging  his professional and personal reputations.

**JURISDICTION – FEDERAL QUESTION AND SUPPLEMTARY**

2.      Plaintiff's action is brought to enforce Plaintiff's rights under 31 U.S.C. § 3730 (h)(2) and 42 U.S.C. § 1395dd over which claims this court has jurisdiction pursuant to 28 U.S.C. §§ 1331.  This action is also brought to enforce Plaintiff's rights under Minn. Stat. §

181.932, the Minnesota Whistleblower Act, Minn. Stat. § 626.557,  the Minnesota Reporting of

Maltreatment of Vulnerable Adults Act, and Minnesota common law rights against intentional

infliction of emotional distress, defamation and breach of contract, over which this court has

supplementary jurisdiction pursuant to 28 U.S.C. § 1367.

**JURISDICTION – DIVERSITY OF CITIZENSHIP**

3.     Plaintiff is a citizen of the State of Washington and each Defendant is a citizen of

the State of Minnesota and the amount in controversy herein exceeds $75,000.00; therefore this

Court also has jurisdiction of this action under 28 U.S.C. ¶ 1332(a)(1).

**PLAINTIFF'S EMPLOYMENT BY DEFENDANT**

4     At all times material, Plaintiff was a medical doctor licensed in the State of

Minnesota.

5.     At all times material, the organizational Defendants were as follows:

A.     Defendant Mayo Holding Co., is a Minnesota corporation, operating through the

assumed names "Mayo Health System," "Mayo Clinic Health System" "Albert Lea Medical

Center - Mayo Health System."

B.     Mayo Clinic Health System-Albert Lea, Inc., is a Minnesota corporation,

C.     Mayo Holding Co., and Mayo Clinic Health System-Albert Lea, Inc, together or

separately operated a hospital now known as Mayo Clinic Health System–Albert Lea in Albert

Lea, Minnesota.  These two Defendants and their hospital are sometimes collectively referred to

herein as "MCHSAL".

D.     Mayo Clinic, Inc., and Mayo Foundation are corporations or organizations that

employed Gregory Warner as Director of Compliance. Upon information and belief Defendant

Nesse was on the boards of one or both organizations. Also upon information and belief, these defendants also exerted direction and control over the operations of MCHSAL.

6.      At times material, the individual Defendants' positions were as follows:

a.  Mark Ciota, M.D. was President or CEO of MCHSAL;

b.  John Grzybowski, M.D.  was Medical Director at MCHSAL;

c.  Dieter Heinz, M.D. was Internal Medicine Department  Chair at MCHSAL;

d.  Robert E. Nesse, M.D., was CEO of "Mayo Health System" or "Mayo Clinic Health System" and was on the Board of Trustees and Board of Governors of the Mayo Clinic;

e.  Steve Underdahl was Administrator at MCHSAL and was Plaintiff's immediate supervisor;

f.  Stephen Waldhoff, was CAO at MCHSAL.

7.      From September 7, 2010, through December 10, 2010, Plaintiff was employed by Defendant as a medical doctor as a hospitalist at MCHSAL pursuant to a contract of employment.  Plaintiff was also employed as an associate consultant researcher at the Mayo Clinic, Rochester, in the Department of Gastroenterology and Hepatology, Endoscopic Ultrasound, Endoscopy, Endoscopy Unit under the mentorship of the Unit Director, Dr. Michael Levy.

8.      Until December 10, 2010, when he was illegally fired by Defendant MCHSAL, Plaintiff was compensated with a salary of approximately $195,000, plus hourly wages calculated at $101.00 per hour, and received fully paid health insurance and retirement benefits, housing and other benefits and a position as Associate Consultant researcher by the Mayo Clinic, Rochester.

9.      At all times material, Plaintiff performed the duties of his positions in a professional and exemplary manner.

10.     Plaintiff's contract of employment as a hospitalist was made up of a Physician Employment Agreement and the Mayo Clinic Integrity and Compliance Program, the latter of which between them included the following terms:

a.  Plaintiff could not be discharged without 60 days' notice without cause;

b.  Plaintiff could be discharged with cause without 60 days' notice;

c.  If Plaintiff reported violations of law to Defendant, he would not be retaliated against in any manner;

d.  Plaintiff required the permission of the CEO of the MCHSAL, to perform his duties as an Associate Consultant Researcher and/or Research fellow.

**PLAINTIFF'S REPORTS OF DEFENDANT'S ILLEGAL ACTS AND SUBSTANDARD PATIENT CARE THROUGH DECEMBER 8, 2010.**

11.     Between September 7, 2010, and December 8, 2010, Plaintiff observed the following:

A.  The Emergency Department and management of MCHSAL exerted extreme pressure on medical staff to admit patients who did not medically require hospitalization to maximize income, including income from Medicare and Medicaid.

B.  Medical staff at Defendant MCHSAL routinely admitted patients from the emergency room that did not require admission.

C.  On many occasions, medical staff at Defendant MCHSAL routinely transferred patients to Mayo Clinic who, medically, did not require transfer because they were being treated by Defendant's staff or were transferred for no medical reason.

D.  Defendant MCHSAL's Emergency staff directed that its medical staff admit patients

for the sole reason to meet the three day hospital stay requirement to qualify these

patients on paper for nursing home benefit under Medicare and Medicaid rules.

E.  Defendant' MCHSAL's ER staff directed that its medical staff admit patients on

"social admits."  These are patients that could be cared for at home but the

Emergency Department would pressure Plaintiff to admit them, misrepresenting that

the patients have no one to care for them even though family members who are

caregivers accompanied the patients in the hospital.

F.  Defendant MCHSAL's management directed that its medical staff admit patients for

"comfort care" who are terminally ill and they only required pain medications but not

hospitalization, which Plaintiff believed resulted in fraudulent billing for medically

unnecessary services, including to Medicare. On or about November 22, 2010,

Plaintiff spoke to Defendant Ciota about this issue and on November 22, 2010, wrote

in an email about setting up a hospice department in the hospital to handle such

patients and legally bill for the services.

G.  Defendant MCHSAL's emergency department and management directed that its

medical staff admit patients who had very minor symptoms, such as a urinary tract

infection or a single instance of vomiting, without first attempting simple outpatient

medications, which admissions were unnecessary and resulted in false certifications

and fraudulent billings to, *inter alia*, Medicare.

H.  On September 15, 2010, there were two instances of negligence, patient safety

compromise, admissions from the ER for "observation" with no valid reason. These

5

instances were reported to Ramona Anderson, Utilization Director, and to Defendant Underdahl.

I.  A continuing problem Plaintiff observed throughout his tenure was that there was a failure of, or no, "hand off" procedures, by which an outgoing physician would assign an incoming or already present physician to care for a patient and inform the incoming or present physician of needs of the patient.  When hand off did not occur, patients went unseen for excessive hours or days and were neglected and denied treatment, and put at risk of medical and bodily harm.  MCHSAL management, including Defendants Ciota, Grzybowski and Underdahl, knew of this problem but did not rectify it.  This unsolved problem:

    i.  Resulted in the death of a patient with high potassium and who was not anticoagulated after surgery because on the morning of the weekend no one signed out the problem of higher than normal and alarming level of potassium or patient condition to the covering physician in the weekend.

    ii.  Resulted in emergency with the aneurysm patient discussed below because the off hours physician was not told about the aneurysm.

    iii.  Resulted in the emergency with the post surgical resection patient because neither the nurses or the surgeon did not know who was taking care of the patient;

    iv.  Resulted in an admitted patient with a heart attack not being seen for nearly 12 hours.

    v.  Resulted in a patient with pneumonia who was not seen for 24 to 36 hours when no one signed him out and no one knew who was talking care of him.

    vi.  Resulted in the status asthmaticus patient described below not being handed off or signed out to anyone.

vii.   Resulted in a patient who was not post-surgery coagulating and dropping dead, who was not signed off to Dir. Popp, who was covering the weekend.

J.   In mid November 2010, Plaintiff observed and reported to Ramona Anderson, MCHSAL Utilization Department Director, that emergency room doctors at MCHSAL misdiagnosed patients, which resulted in unnecessary or dangerous transfers or no transfers when transfer was indicated, all amounting to substandard care and/or fraudulent billing because billings would be based on false information used to justify the billing.

K.   In or about October, 2010, Defendant MCHSAL unnecessarily transferred one of Plaintiff's patients whom he had treated for several days on Plaintiff's first day off to avoid Plaintiff's known refusal to approve unnecessary, fraudulent transfers.

L.   On and about November 10, 2010, the continued pattern of negligence in the ER and by other physicians, pushing admissions for the invalid reasons and endangerment of patient lives and safety.

M.   On November 21, 2010, the chronic problems continued of patient safety compromise, handoff problems and solutions that had been rejected by MCHSAL.

N.   During Plaintiff's employment at MCHSAL, MCHSAL used an nurse to see and follow wound care patients in the hospital. A licensed physician was supposed to see and follow up on patients needing wound care in order to bill Medicare for the service. Plaintiff investigated the situation and suspected fraudulent billing and asked the "wound care" nurse to provide him with billing codes used by the wound care department to report wound care and told Defendant Ciota about it. Plaintiff also called the Coding department and asked "Teresa" to provide the billing coding for patients that needed wound care. Neither the wound nurse or billing coder responded

to Plaintiff.  Plaintiff sent an email dated November 22, 2010, to Defendants Ciota, Grzybowski, Heinz, Underdahl and other administrators  reporting the problem of the nurse doing wound care and suggesting that a physician, including Plaintiff, do wound care and properly code for it instead of an unlicensed nurse.

O.  On or about November 25, 2010, Defendant MCHSAL wanted to fraudulently and unnecessarily transfer a stroke patient of Plaintiff, which Plaintiff resisted.

P.  Physicians at Defendant MCHSAL overbilled for patient contacts, including billings for Medicare and Medicaid.  For example, on weekends doctors would see 20-25 patients in two hours, but bill 15-30 minutes per patient. In discussions about this with Defendants Heinz and Underdahl, they told Plaintiff that productivity chair in particular was the "most efficient" at doing this.

Q.  Many doctors in Family Practice, including Defendants. Ciota, Grzybowski, Heinz and Dr. Boyce did not perform physical examinations of patients beyond placing stethoscope on a patient's chest but documented and billed for physical exams of 30 minutes including billings for Medicare and Medicaid, which information was not true..

R.  Defendant MCHSAL encouraged "comfort care" or "no code" decisions about patients in order to save money on treating them, despite the desire of patients to continue treatment and not die.  In one case a nurse supervisor took a chart away from Plaintiff to prevent him from writing treatment orders for such a patient.

S.  In October or November 2010, a nurse supervisor allowed a patient to die without calling the on call physician for an hour when the patient suffered hypotension and the nurse should have called immediately. Plaintiff reported this incident to

Defendant Grzybowski on multiple occasions and to nurse supervisor Routh and others.

T.  On December 7, 2010, a patient from the emergency room who had been moved to the Special Care Unit  had not been admitted by 7:00 a.m. even though he arrived at the emergency room at 2:30 or 3:00 a.m. with extremely high blood pressure and chest and abdominal pain radiating into the back and a history of aneurysms.  No radiological or other tests were ordered and his medical history was not reviewed. The assigned on-call doctor, who was also chair of the hospital "productivity committee," did not come to examine the patient, screen the patient, stabilize the patient or admit the patient although he was called.  Plaintiff reported this incident to Ramona Anderson, Utilization Department, on December 7, 2010.

U.  On December 7 and 8, 2010, Defendant Grzybowski, Medical Director of Defendant MCHSAL, who was on MCHSAL's on call list for Family Practice, failed and refused to come to the hospital to treat two patients, both in emergency status.  One was a post-surgical colon resection suffering atrial fibrillation with rapid ventricular response and heart rate of 140-150 per minute (like running a marathon), sepsis and pneumonia.  The other patient had status asthmaticus and respiratory failure and was blue in color.   These patients were in near death conditions, of which Defendant Grzybowski was told, yet he did not come to the hospital despite urging by Emergency doctor, Plaintiff and by a nurse on duty.  Plaintiff reported Defendant Grzybowski's failure to respond to the calls to Defendant Underdahl and nursing supervisor Routh on December 8, 2010, and Plaintiff also asked a nurse named

9

Stephanie to report them to hospital administration in the early morning of December 8, 2010.

V. Plaintiff had to stay overnight after his regular shift to care for Defendant Grzybowski's patients, sleeping in a hospital bed near one of them.

W. On December 8, 2010, when he finally arrived at the hospital, Defendant Grzybowski wanted to transfer the patient in respiratory failure, whom he had earlier refused to come to the hospital to treat, to the Mayo Clinic in Rochester.  Transfer was unnecessary and medically not indicated and Plaintiff refused to approve the transfer since the hospital had to first stabilize this patient, who was experiencing respiratory failure, and which stabilization had not been achieved and Plaintiff was caring for her already in the SCU where stabilization treatment could take place, but she was not admitted to the hospital.

X. On December 8, 2010, Plaintiff asked Defendant Grzybowski why he had not come to the hospital when he had been called the night before as the on call physician. Defendant Grzybowski was very angry.

Y. At the time of Defendant Grzybowski's request to transfer the patient whom Plaintiff refused to transfer, the patient had an emergency medical condition because she was in repertory failure, she did not tolerate the BIPAP, could not breath sufficiently on her own and still required hours of adjustment of treatment before she was stabilized.

Z. On December 8, 2010, Defendant Grzybowski dictated treatment notes for  the patients whom he had refused to treat earlier, and had to ask the patient for their medical history, which histories he should have been at the hospital to obtain many hours earlier.

10

AA.    On December 7, 2010, two additional patients on the floor /special care unit

received substandard care endangering their lives.

    1.   A patient with hypernatremia (low sodium) with sodium level of about 116

was corrected too fast to 132 over 5-6 hours without monitoring, without

ordering sodium level tests  in the interim to control correction, thus

subjecting patient to potential swelling and damage of her brain,  Plaintiff as

hospitalist had to keep the patient in SCU for two extra days for monitoring

and correction of the problem, which added more billing for her to correct for

the mistakes and negligence,   Plaintiff reported the incident to Dr. Popp and

Ramona Anderson, Utilization Department, on December 7, 2010 as a patient

with  hypernatremia that was neglected by the on call physician and ER.

Plaintiff also reported it to Defendants Ciota and Underdahl on December 11,

2010.

    2.  The second patient had atrial fibrillation that was not followed up

appropriately and medications were not adjusted or changed for the patient as

outpatient.   It  was a common problem at the hospital that the medication list

was not updated by primary care physicians, especially family practice

physicians, which was quite often a safety problem and substandard of care.

Plaintiff  reported this to Defendant Heinz and Dr. Shelhamer and the

pharmacy director and personnel and talked about the problem with Dr. Popp

and Dr. Vocal to try to address the problem.  Plaintiff  referred to this incident

with  Defendant Ciota on December 11 and 13, 2010.

12.    BB.    Prior to December 8, 2010, Plaintiff observed Emergency Department staff changing the cause of admissions to avoid Medicare's 30 day readmission rule, that if a patient is readmitted for the same reason within 30 days the hospital would not be reimbursed. An example was a situation Plaintiff discussed with Defendant Underdahl on December 10, 2010, involving a patient in the Emergency Room who was having an exacerbation of her congestive heart failure and who had been admitted within the previous thirty days for that condition, wherein the Emergency doctor tried.to admit her for "choking on a pill," which chocking episode had passed and did not require hospitalization.  Plaintiff had resisted that admission as fraudulent. Plaintiff  began investigating obviously medically unnecessary transfers of patients at MCHSAL in September 2010.  Plaintiff told Defendants Underdahl, Grzybowski, and Ciota that those transfers should stop because they cause unnecessary expense to patients, families and Medicare and Medicaid.  Plaintiff also collected information about unnecessary transfers from Drs. Shelhamer, Popp and Vocal. Defendant Underdahl told Plaintiff that he had been told that there  was no reason they could not keep the patients at MCHSAL.  Defendant Underdahl and other staff told Plaintiff that the reason for transferring patients was financial .

13.    Between September 2010 and December 2010, Plaintiff  took notes of his observations, including case details, concerning unnecessary patient transfers (names and dates), mislabeling diagnoses to justify admissions, the list of patients Plaintiff was asked to admit fraudulently, and  a  list of patients that were neglected because of hand off problems or comfort care patients that were admitted just to die, and social admit patients,. To the best of Plaintiff's recollection, the patients included those of  Dr. Vocal, Dr. Boyce, Defendant Heinz, and Defendant Grzybowski.

14.     Plaintiff also asked Emergency Room doctors, particularly Dr. Weise, to call Plaintiff before they transfer patients to Mayo Clinic.

15.     On and prior to December 8, 2010, and in addition to Plaintiff's reports hereinabove alleged, Plaintiff reported the foregoing observations and facts, to one or more of Defendant MCHSAL's managers Defendant Heinz, Defendant Underdahl, Defendant Ciota, Defendant Grzybowski, Monica Fleegel, Director of Human Resources and Ramona Anderson, Utilization Department at MCHSAL.  This includes the following non-exclusive list of reports:

    A.  On November 22, 2010 to Defendants Ciota, Gryzbowski, Heinz and Underdahl.

    B.  In mid-November 2010, Plaintiff told Defendant Heinz that social and other admits from the ER were fraudulent and Defendant Heinz agreed.

    C.  On December 7, 2010, Plaintiff reported the non-admission,, hand off failures and substandard care of the aneurysm patient to Ramona Anderson, MCHSAL's Utilization Department.

    D.  On December 8, 2010, Plaintiff reported Defendant Gryzbowski's refusal to come to the hospital as an on-call physician to the see the two patients facing emergency and life threatening situations to supervisor Defendant Underdahl and nursing charge nurse Routh.

    E.  On the morning of 8th of Dec. Plaintiff asked nurse Stephanie to report the non-response from Dr. Grzybowski and endangering patients' lives to administration

    F.  Plaintiff reported the refusal of transfer of stroke patient to charge nurse Routh, on or about the November 25, 2010.

G.  Plaintiff reported hand off and patient safety compromise and substandard care to Defendants Underdahl, Ciota, Grzybowski, Heinz and Ramona Anderson, and Nancy (nurse manager) on multiple occasions in October and November 2010.

H.  Plaintiff reported to Dr. Shelhamer about hand off problems, patient safety compromise and substandard of care on November 21st, who in turn passed voiced Plaintiff's complaint to Defendants Underdahl, Heinz and Grzybowski and Dr. Ulrich (emergency department manager).

I.  Plaintiff complained and told Drs. Shelhammer, Popp, Vocal, Ramona Anderson, and Defendant, Grzybowski and a nurse supervisor (Pat) about practice of seeing 20-25 patients in 2 -3 hours including pediatric and OB/GYN patients, which is not enough to take minimal history or do the physical exams that are being documented for billing purposes.

**PLAINTIFF'S DISCHARGE AND INTERNAL APPEAL**

16.    Shortly before December 8, 2010, Defendant Gryzbowski told Plaintiff he was doing a "great job".

17.    On December 8, 2010, Plaintiff was entrusted by Defendants to care for patients at MCHSAL.

18.    Then, on December 8, 2010, at about 1:30 p.m., Defendant MCHSAL, by Defendant Underdahl placed Plaintiff on administrative leave because of Plaintiff's reports of the matters described in Paragraph 11.

19.    On December 8, 2010, Defendant Underdahl stated in the presence of a nursing supervisor that "We have been having issues with your practice" as the reason for the

14

administrative leave.  Defendant Underdahl's statement is false if it implies that Plaintiff failed to meet a standard of care or behavior.

20.     When pressed by Plaintiff, Defendant Underdahl stated that his concern was that Plaintiff had ordered an FDA approved medication for a valid medical reason and that Plaintiff had not responded to a page made to another doctor's pager.

21.     On December 8, 2010, Defendant Underdahl told Plaintiff that Defendant Grzybowski would investigate Plaintiff .  Plaintiff complained that Defendant Grzybowski was biased and said "how would you let the medical director investigate me and he didn't come to see his patients?"

22.     Other medical staff objected to Defendant Underdahl that Defendant Grzybowski had a conflict of interest and should not investigate Plaintiff.

23.     On December 10, 2010, Defendant MCHSAL by Defendant Grzybowski discharged Plaintiff because of Plaintiff's reports of the matters described in Paragraph 11.

24.     On December 10, 2010, Defendant's Grzybowski and Underdahl pressed Plaintiff to resign immediately.

25.     On December 10, 2010, Defendant Underdahl told Plaintiff that since they had last talked (December 8, 2010) "we have circled back around" to obtain information to justify discharging Plaintiff.

26.     On December 10, 2010, during the meeting at which they discharged Plaintiff, Defendants Grzybowski and Underdahl  made the following false statements to and concerning Plaintiff within the presence and hearing of each other and Monica Fleegel, human resources director:

A.  You  "can't handle the work load" of his hospitalist position;

B.  "It is as difficult to get you to see patients sometimes;"

C.  "You are resistant to admit from the ER," to which Plaintiff responded that he only

resisted fraudulent admissions;

D.  "Sometimes you told me you were not comfortable seeing patients;"

E.  Nurses say you "just disappear" and are hard to find;

F.  You "don't participate in the ER;"

G.  You are on "90 day probation," which was contrary to MCHSAL's  representation to

Plaintiff on September 16, 2010, that Plaintiff would be reviewed in 12 months;

H.  Plaintiff's "performance didn't meet standards," which was also stated in Plaintiff's

letter of discharge dated December 10, 2010, from Defendant, signed by Defendant

Grzybowski.

I.  "If you don't resign, it would close your options with potential employers"

J.  That Defendant Gryzbowski had told Plaintiff recently that Plaintiff was doing a "fine

job".

27.     On December 10, 2010, Plaintiff told Defendants Grzybowski and Underdahl of

the matters related in ¶ 11 herein, including the incidents occurring on December 7 and 8, 2010,

when Defendant Grzybowski refused to come to the hospital.  Plaintiff offered to give Defendant

Underdahl his documentation of the matters he had investigated, but Underdahl refused.

28.     Defendants Grzybowski and Underdahl refused to provide Plaintiff with any

details or witnesses to support their accusations against Plaintiff.

29.     Plaintiff appealed his discharge through several levels of internal review,

involving personnel from Mayo Clinic Health System and Mayo Clinic, which process could

have resulted in reversal of Plaintiff's discharge.  Defendant appealed to Defendants Underdahl

and Ciota on Dec 11, then to Defendant Waldhoff in March 2011, and then to an Ad Hoc

committee made up of Defendant Heinz, Tyson Stackhouse of Mayo Clinic Health System,

Diane Clark, Physicians Services in Albert Lea, Dr. Gosen, a psychiatrist from Albert Lea, a

human resources member and a physician from another Mayo Clinic Health System site.

30.     Plaintiff  asked Defendant Waldhoff, CAO of MCHSAL,  for review of his

discharge by an external and unbiased committee but he refused.

31.     On December 11, 2010, Defendant Grzybowski told Plaintiff to resign and that if

he did not he would give Plaintiff a bad reference if a potential employer called him.

32.     On December 11, 2010, Plaintiff repeated his reports contained in ¶ 11 herein to

Defendant Ciota.

33.     On December 11, 2010, Defendant Ciota told Plaintiff in an email that Plaintiff's

discharge had nothing to do with Plaintiff's care of patients or cases, according to information

provided to him by Defendant Underdahl.

34.     On December 13, 2013, Defendant Ciota told Plaintiff in writing that Plaintiff was

discharged because "it wasn't a good fit."

35.     On December 14, 2010, Plaintiff again repeated his reports contained in ¶ 11 to

Defendant Ciota.

36.     On December 14, 2010, Plaintiff complained to Defendants Mayo Foundation and

Mayo Clinic, Inc.'s compliance director, Gregory Warner, of the matters set forth in ¶ 11 herein.

About three days later, Mr. Warner told Plaintiff that his office was involved in investigating

billing issues, not discharges. Plaintiff offered to give Defendant Underdahl his documentation of

the matters he had investigated, but Underdahl refused.

37.     On December 19, 2010, Defendant MCHSAL locked Plaintiff out of his employer provided housing and removed Plaintiff's notes and records regarding his investigation.

38.     On December  21, 2010, Dr. Levy, Plaintiff's research supervisor at the Mayo Clinic, told Plaintiff that someone  "high up in management" told him that Plaintiff could not work in research anymore at the Mayo Clinic, and Plaintiff's research position at the Mayo Clinic was terminated.

39.     After December 10, 2010, during the pendency of the steps in Plaintiff's appeal of his discharge, Plaintiff reported the following observations to Defendants and others as follows:

A.  On January 4, 2011, Plaintiff reported the information contained in ¶ 11 herein to the Minnesota Board of Medicine, of which report Defendants soon were aware;

B.  On January 4, 2011, Plaintiff reported the information contained in ¶ 11 herein to Dr. Noseworthy, CEO of the Mayo Clinic;

C.  On February 7, 2011, Plaintiff reported the information contained in ¶ 11 herein to Defendant Nesse.

D.  In March 2011, Plaintiff reported the information contained in ¶ 11 herein to Defendant Waldhoff.

40.     On or about April 6, 2011, Defendant Waldhoff, made the following statements concerning Plaintiff:

A.  "ALMC staff, especially members of the Nursing Department, were not able to find you while on-duty and you were not responsive to phone calls and over-head pages; this situation was a consistent complaint from nursing and not a development that was common with other providers."  This statement was false.

B.  Emergency Room staff, including Physician colleagues, found you demeanor to be adversarial and you resisted their requests to admit patients needing hospitalization. This statement was false in that Plaintiff does not believe his demeanor with Emergency Room staff was adversarial.  This statement is true in that Plaintiff did resist Emergency Room staff's requests to admit patients when there was not medical necessity to do so.

C.  Nursing Department members questioned your judgment and interpretations because they believed these lacked consistency (e.g. IV administration of Tylenol; Swallow Study; dictation was contrary to verbal orders given to Nursing; as a result, there was a lack of trust in your medical decision making by members of the ALC Department of Nursing.  This statement was false.

D.  "You demonstrated difficulty with organizing and prioritizing work, and subsequently, some documentation was not timely."  This statement was false.

E.  "Some Medical Staff found your interpersonal communication skills to be less than collegial; personal conflicts were present with other members of the Medical Staff." This may be true among medical staff who felt threatened by Plaintiff's investigation and resistance to unnecessary medical treatment, admissions and transfers.

F.  "Some female members of the Nursing Department found your personal comportment to be inappropriate and disrespectful, and, at times, aggressive and offensive; they cited unwanted invitations to breakfast or dinner and unwanted touching of their anatomy; these interactions violated personal and professional boundaries."  Plaintiff did not behave inappropriately with female nurses and this statement is false.

19

41.     On June 30, 2010, Defendant Grzybowski falsely documented and told the ad hoc committee reviewing Plaintiff's discharge that he had met with Plaintiff 13 times, along with Defendant Heinz, to talk about problems with Plaintiff's performance and communications.

42.     At no time between Plaintiff's discharge meeting on December 10, 2011, and Defendant's confirmation of Plaintiff's discharge did Defendants provide any specific facts or the names of any witnesses supporting its accusations allegedly causing Plaintiff's discharge.

43.     Defendants manufactured and made up charges against Plaintiff that had no basis in fact.

44.     On July 5, 2011, Plaintiff attempted to report to Defendants Mayo Clinic, Inc. and Mayo Foundation's compliance director new information that one patient at Albert Lea Medical Center died in May or June 2011 when she was not anticoagulated post-surgery performed by Defendant Ciota and that on or about March 26, 2011, a patient with pneumonia was misdiagnosed with UTI and no one including the on-call physician, Defendant Heinz, saw the patient for 24-36 hours.  However, on July 6, 2011, Mr. Warner rejected Plaintiff's attempt and referred him to Defendant Nesse.

45.     On July 7, 2011, Plaintiff did report to the Defendant Nesse,  the information described in ¶ 40 above.

46.     On July 8, 2011, Defendant MCHSAL confirmed "management's decision to seek your resignation and end your employment agreement."

47.     Upon information and belief, in 2011 Defendant Gryzbowski effectively blackballed Plaintiff at other hospital-potential employers of Plaintiff, either by not returning their calls or providing false information.  The hospitals involved included Mayo hospitals in

LaCrosse, WI, Austin, MN Owattonna, MN and St. Franciscan Health System in Washington state.

## COUNT I

### VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3730 -  DEFENDANTS MCHSAL, MAYO CLINIC, INC., MAYO FOUNDATION, MARK CIOTA, M.D., JOHN GRZYBOWSKI, M.D., DIETER HEINZ, M.D., ROBERT E. NESSE, M.D., STEVE UNDERDAHL AND STEPHEN WALDHOFF

48.     Plaintiff re-alleges the forgoing paragraphs in this Complaint.

49.     Plaintiff's actions in investigating and resisting fraudulent and unnecessary hospital admissions and transfers of patients and fraudulent billings by Defendant MCHSAL and Plaintiff's reports and complaints about same, as described in ¶ 11 and 12., 13, 14, 15, 24.C, , 25, 29 and 33, 35, 40 and 41 herein, constituted efforts by Plaintiff to stop one or more violations of 31 U.S.C. § 3729, including but not by way of limitation, presenting false claims to the United States for payment, and using false records material to a false or fraudulent claim for payment to the United States.

50.     False claims and false records supporting claims for Medicare paid services could result in payment by the United States that was not due.

51.     Plaintiff's resistance to said illegal acts and his investigating and reporting of same described above was protected under 31 U.S.C. § 3730 (h)(1).

52.     Defendants Mayo Clinic, Inc., Mayo Foundation, Ciota, Grzybowski, Heinz, Nesse, Underdahl and Waldhoff  caused Defendant MCHSAL to discharge Plaintiff and later affirm Plaintiff's discharge because of Plaintiff's engaging in actions protected under 31 U.S.C. § 3730 (h)(1).

53.     Defendant MCHSAL discharged and affirmed Plaintiff's discharge because of Plaintiff's engaging in actions protected under 31 U.S.C. § 3730 (h)(1).

54.     As a result of Defendants' violation of 31 U.S.C. § 3730 (h)(1), Plaintiff has lost his physician's job with Defendant, has lost his research consulting job at the Mayo Clinic, has lost important practice and research experience, has lost past wages and benefits and future earning capacity, has lost has suffered and continues to suffer, severe emotional distress, humiliation, embarrassment and loss of enjoyment of life, and has and will incur attorney fees, for all of which Defendants are liable to Plaintiff.

55.     Defendants are additionally liable to Plaintiff for two times lost back pay pursuant to 31 U.S.C. § 3730 (h)(2).

## COUNT II

### VIOLATION OF EMTALA – 42 U.S.C. § 1395dd - DEFENDANTS MCHSAL, MAYO CLINIC, INC., MAYO FOUNDATION,

56.     Plaintiff re-alleges the foregoing paragraphs of this Complaint.

57.     Count II Defendants are subject to the terms of 42 U.S.C. § 1395dd and are "hospitals" within the meaning of the statute..

58.     Defendant MCHSAL discharged Plaintiff on December 10, 2010, contrary to 42 U.S.C. § 1395dd (i) because Plaintiff refused to authorize the transfer of the patient described in ¶ 11.W, who had an emergency medical condition and who had not been stabilized and because Plaintiff reported violations of requirement of EMTALA, to wit: Dr. Gryzbowski's refusal to come to the hospital in response to on-call requests.  As a result of Defendants' violation of 42 U.S.C. § 1395dd(i), Plaintiff has lost his physician's job with Defendant, has lost his research consulting job at the Mayo Clinic, has lost important practice and research experience, has lost past wages and benefits and future earning capacity, has lost has suffered and continues to suffer, severe emotional distress, humiliation, embarrassment and loss of enjoyment of life, and has and will incur attorney fees, for all of which Count II Defendants are liable to Plaintiff.

**COUNT III**

**VIOLATION OF MINN. STAT. ¶ 181.932 - DEFENDANT MCHSAL AND MAYO CLINIC, INC.**

59.     Plaintiff re-alleges the foregoing paragraphs of this Complaint.

60.     Minn. Stat. 181.932, Subd. 1, provides in pertinent part as follows:

> An employer shall not discharge, discipline, threaten, otherwise discriminate against, or penalize an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because:
>
> (1)  the employee, or a person acting on behalf of an employee, in good faith, reports a violation or suspected violation of any federal or state law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official;
> * * *
>
> (3) the employee refuses an employer's order to perform an action that the employee has an objective basis in fact to believe violates any state or federal law or rule or regulation adopted pursuant to law, and the employee informs the employer that the order is being refused for that reason;
>
> 4) the employee, in good faith, reports a situation in which the quality of health care services provided by a health care facility, organization, or health care provider violates a standard established by federal or state law or a professionally recognized national clinical or ethical standard and potentially places the public at risk of harm;

61.     Pursuant to Minn. Stat. §181.935, Plaintiff may sue his employer  for relief from its violation of Plaintiff's rights under Minn. Stat. §181.932.

62.     Between September 7, 2010, and July 7, 2011, Plaintiff in good faith, reported violation or suspected violation of the following federal and state law or rule adopted pursuant to law to Defendant MCHSAL, to wit:

A.  Violation of EMTALA, 42 U.S.C. § 1395dd et seq;

B.  Violation of  False Claims Act, 31 U.S.C. § 3729 and § 3730;

C.  Violation of Minnesota Vulnerable Adult Act, Minn. Stat. § 626.557;

D.  Violation of Minn. Stat. § 609.233.

63.     On January 4, 2011, Plaintiff in good faith, reported a violation or suspected violation of federal or state law or rule adopted pursuant to law to the State of Minnesota Board of Medical Practices, a government agency, to wit:

A.  Violation of EMTALA, 42 U.S.C. § 1395dd et seq;

B.  Violation of  False Claims Act, 31 U.S.C. § 3729 and § 3730;

C.  Violation of Minnesota Vulnerable Adult Act, Minn. Stat. § 626.557;

D.  Violation of Minn. Stat. § 609.233.

64.     Between September 7, 2010, and July 7, 2011, Plaintiff in good faith, reported to the State of Minnesota Board of Medical Practices, a government agency, and to Defendant MCHSAL situations in which the quality of health care services provided by Defendant's hospital and medical staff providers violated a standard established by federal or state law or a professionally recognized national clinical or ethical standard and potentially places the public at risk of harm, including Defendant Grzybowski's not responding within a reasonable time to on call calls and the neglect of the patient described in ¶ 11.T. herein, the failure to order medically required tests for that patient, and the ongoing hand off failures at MSHSAL, which resulted in patients not being seen and neglected.

65.     On January 4, 2010, Plaintiff in good faith, reported to the State of Minnesota Board of Medical Practices, situations in which the quality of health care services provided by Defendant's hospital and medical staff providers violated a standard established by federal or state law or a professionally recognized national clinical or ethical standard and potentially places the public at risk of harm, including Defendant Grzybowski's not responding within a reasonable time to on call calls and the neglect of the patient described in ¶ 11.T. herein, the failure to order medically required tests for that patient, and the ongoing hand off failures at

MSHSAL, which resulted in patients not being seen and neglected.

66.     The standards of care that Plaintiff reported violated include:

a.   physicians or the hospital did not exhibit the ordinary skill and ability of the members of his profession.

b.   physicians' or hospital's did not exhibit the ordinary skill and ability;

c.   physicians' did not comply with EMTALA's standard that an on-call physician must respond within a reasonable period of time when called to the hospital;

d.   physicians' or hospital's did not comply with the criminal neglect and vulnerable adult statutes' prohibition of neglecting patients;

e.   The 2008 Joint Commission Requirements that hospitals implement a standardized approach to handoff communications, including an opportunity for individuals involved in the process to ask and respond to questions.

f.   "Do no harm" – attributed to Hippocrates

67.     Plaintiff refused Defendant's order to perform an action that Plaintiff had an objective basis in fact to believe violates any state or federal law or rule or regulation adopted pursuant to law, and the Plaintiff informed the Defendant MCHSAL that the order was being refused for that reason, to wit: on December 10, 2010, Plaintiff told Defendant's management that he resisted admitting patients where the basis claimed by Defendant or other staff members was fraudulent.

68.     Defendant discharged Plaintiff because of Plaintiff's said reports and refusal to make fraudulent admissions, in violation of Minn. Stat. § 181.932, Subd. 1.

69.     As a result of Defendant's violation of Minn. Stat. § 181.932, Subd. 1., Plaintiff has lost his physician's job with Defendant, has lost his research consulting job at the Mayo Clinic, has lost important practice and research experience, has lost past wages and benefits and future earning capacity, has lost has suffered and continues to suffer, severe emotional distress, humiliation, embarrassment and loss of enjoyment of life, and has and will incur attorney fees, for all of which Defendants are liable to Plaintiff.

## COUNT IV

**VIOLATION OF MINNESOTA REPORTING  MALTREATMENT OF VULNERABLE ADULTS ACT - DEFENDANTS MCHSAL, MAYO CLINIC, INC., MAYO FOUNDATION, MARK CIOTA, M.D., JOHN GRZYBOWSKI, M.D., DIETER HEINZ, M.D., ROBERT E. NESSE, M.D., STEVE UNDERDAHL AND STEPHEN WALDHOFF,**

70.     Plaintiff re-alleges the foregoing paragraphs of this Complaint.

71.     Several of the observations and matters that Plaintiff reported or complained about, described in Paragraphs 11, 12., 13, 14, 15, 24.C, , 25, 29, 33, 35, 40 and 41 herein involved mistreatment of vulnerable adults as defined in the Minnesota Vulnerable Adult Protections Act, Minn. Stat. § 626.5572, Subd. 21 (a) (4).For example, the incidents described in ¶¶ 11.I and 11T involved neglect of those patients.

72.     Defendants Mayo Clinic, Inc., Mayo Foundation, Ciota,  Grzybowski, Heinz, Nesse, Underdahl and Waldhoff  caused Defendant MCHSAL to discharge Plaintiff and to reconfirm the discharge because of and within 90 days of his reports of maltreatment of vulnerable adults, contrary to Minn. Stat, § 626.557, Subd. 17, and Plaintiff's discharge and the affirmance of his discharge are therefore presumed to be retaliatory in violation of said statute.

73.     Defendant MCHSAL discharged Plaintiff because of and within 90 days of his reports of maltreatment of vulnerable adults, contrary to Minn. Stat, § 626.557, Subd. 17, and Plaintiff's discharge is therefore presumed to be retaliatory in violation of said statute.

74.     As a result of Defendants' violation of Minn. Stat. § 181.932, Subd. 1., Plaintiff has lost his physician's job with MCHSAL, has lost his research consulting job at the Mayo Clinic, has lost important practice and research experience, has lost past wages and benefits and future earning capacity, has lost has suffered and continues to suffer, severe emotional distress, humiliation, embarrassment and loss of enjoyment of life, and has and will incur attorney fees, for all of which Defendants are liable to Plaintiff

75.     Defendants are also liable to Plaintiff on this Count III for punitive damages in an amount up to $10,000 in addition to all other remedies available to him under this Complaint.

## COUNT V
## BREACH OF CONTRACT - DEFENDANT MCHSAL

76.     Plaintiff re-alleges the foregoing paragraphs of this Complaint.

**77.**     Defendant MCHSAL's discharge of Plaintiff was contrary to and in breach of the term of Plaintiff's contract providing that if Plaintiff reported violations of law to Defendant, he would not be retaliated against in any manner.

78.     In practice, the parties agreed that Plaintiff would work at the hospital one week on and one week off and receive three extra weeks to use for vacation.  Plaintiff was scheduled to work a block of seven days (from 7:00 am to 7:00 pm) on and a week (seven day block) off. Days and hours worked beyond a seven day block were agreed to be paid at $101.00 dollars per hour. Also the regular Sundays worked in Plaintiff's week (seven days on) were not paid. Plaintiff  was told by Diane Clark, lead of physician services, and the hospital's payroll department representative that there would be a reconciliation at the end of every quarter so that it does not cause the hospital a problem with the extra hours worked above 40 hours average per week..

79.     Plaintiff also worked numerous hours in excess of the number required by his contract of employment, and was entitled to additional compensation, but Defendant has failed and refused to pay same.

80.     The exact amount of unpaid compensation due to Plaintiff is not known and Plaintiff is entitled to an accounting of his hours worked and amounts paid and amounts remaining unpaid.

81.     As a result of Defendant's breach of contract, Defendant owes Plaintiff back wages and benefits and prospective wages and benefits.

**COUNT VI**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS – DEFENDANT MCHSAL**

82.     Plaintiff re-alleges the foregoing paragraphs of this Complaint.

83.     In this Count, Defendant MCHSAL acted through its agents and employees acting within the course and scope of their employment, including at least the following persons: Mark Ciota, M.D., John Grzybowski, M.D., Robert E. Nesse, M.D., Steve Underdahl, and Stephen Waldhoff.

**84.**     At all times material Defendant through its employees and agents acting within the course and scope of their employment knew and believed that Plaintiff suffered from bipolar disorder and that placing Plaintiff in a stressful situation in that Plaintiff perceived was hopeless and in which Plaintiff was helpless would cause intense mental distress.

**85.**     At all times material Defendant knew through its agents and employees acting within the course and scope of their employment that Plaintiff had devoted years of time and effort to earning the right to practice medicine in the United States and to obtaining positions at the prestigious Mayo Clinic system of health care institutions.

**86.**     Between December 8, 2010, and July 8, 2011, Defendant through its agents and employees acting within the course and scope of their employment engaged in a pattern of extreme and outrageous conduct toward Plaintiff, which conduct was intentional or reckless, and which conduct had the purpose and effect of causing Plaintiff severe emotional distress.

**87.**     Said pattern of behavior involved:

A.  threatening to discharge Plaintiff and ruin his career and life if he did not resign;

B.  making false accusations that Plaintiff's professional performance was substandard in multiple aspects;

C.  summarily evicting Plaintiff from his housing;

D.  making ever changing allegations supporting Plaintiff's discharge;

E.  never providing specifics of incidents or the identity of witnesses to Plaintiff's alleged behavior;

F.  promising to investigate Plaintiff's complaints and reports of violations of law, substandard patient care and compromises of patient safety at MCHSAL's hospital, but never doing so;

G.  instead, escalating as Plaintiff reported additional incidents of violations of law and substandard medical care at Albert Lea Medical Center.

H.  making false accusations that Plaintiff had engaged in sexually inappropriate behavior with female staff;

I.  misrepresenting and fraudulently documenting to the "ad hoc committee" reviewing Plaintiff's discharge that 13 meetings had been held with Plaintiff before his discharge to correct alleged deficiencies in Plaintiff's performance.

88.     As a result of Defendants' behavior, Plaintiff was caused severe, continuous and excessive emotional distress, nightmares, adjustment disorder, and attempted suicide, requiring hospitalization and continuous therapy, all to Plaintiff's pecuniary damage for which he is entitled to compensation from Defendant.

## COUNT VII
## DEFAMATION – DEFENDANTS MCHSAL, GRZYBOWSKI, UNDERDAHL, AND WALDHOFF

89.     Plaintiff re-alleges the foregoing paragraphs of this Complaint.

90.     The statements hereinabove alleged to have been made by Defendant MCHSAL'S officers and agents, Defendants Grzybowski, Underdahl and Waldhoff, concerning Plaintiff were false, were communicated to one or more persons other than Plaintiff, and tended to harm Plaintiff's professional and personal reputation and to lower Plaintiff  in the estimation of the community.

91.     Plaintiff has been foreseeably compelled, and will foreseeably be compelled in the future, to self-republish Defendants' defamatory statements to potential employers and medical profession regulators.

92.     Defendants' defamatory statements were made without privilege.

93.     Any privilege Defendants had to make the defamatory statements was defeated because, inter alia:

      a.  Gryzbowkski was angry at Plaintiff on December 8, 2010, over Plaintiff's refusal to transfer his patient and questioning his whereabouts when not responding as an on call physician;

b.  Plaintiff had complained and reported illegal activities and substandard care involving MCHSAL staff;

c.  Defendants did not have to say anything at all about Plaintiff.

d.  Defendant MCHSAL's investigation of Plaintiff's was performed by persons involved in illegal or wrongful acts that Plaintiff had complained about.

e.  The majority of Defendant MCHSAL's panel that reviewed Plaintiff's discharge were employees of MCHSAL and Mayo Clinic Health System.

94.  Defendants made and published the aforesaid defamatory statements maliciously with knowledge or reckless disregard of their falsity.

95.  Defendants' defamatory statements were made with ill-will and improper motive or wishing wantonly and without cause to injure the plaintiff.

96.  Defendants' defamatory statements concerning Plaintiff affected Plaintiff in his business, trade, profession, office, or calling and are defamatory per se and are actionable even without proof of actual damages and give rise to a presumption of general damages for harm to Plaintiff's reputation.

97.  As a result of Defendants' publication of said false, defamatory statements concerning Plaintiff as described above, Plaintiff has suffered actual and general injury to his reputation, mental suffering, and alienation of his associates, all to Plaintiff's pecuniary damage.

**COUNT VIII**
**PUNITIVE DAMAGES – FEDERAL CLAIMS**

98.  Plaintiff re-alleges the foregoing paragraphs of this Complaint.

99.  Defendants' wrongful acts in violation of Plaintiff's federally protected rights hereinabove alleged were committed by them with malice and reckless indifference to Plaintiff's

federally protected rights and Defendants had knowledge that they may have been acting in violation of federal law.

100.     Plaintiff is entitled to punitive damages on his federal claims herein.

WHEREFORE, Plaintiff demands judgment against Defendant:

1.  Reinstating Plaintiff to his position at Defendants MCHSAL and  Mayo Clinic;

2.  Requiring an accounting from Defendant MCHSAL of compensation due to Plaintiff;

3.  For an amount of money as will fully and fairly compensate Plaintiff for his damages herein, together with interest, costs and disbursements and attorney's fees allowed by law.

4.  For such other and further relief as the Court deems just.

Dated: February 1, 2013.


/s Richard T. Wylie_____
Richard T. Wylie, ID No. 11912X
222 South Ninth Street
Suite 1600
Minneapolis, MN 55402
612-337-9581
**ATTORNEY FOR PLAINTIFF**