# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

Alaa Elkharwily, M.D.,                    **Civil No. 12-3062 (DSD/JJK)**

        Plaintiff,

v.

Mayo Holding Co., a corporation, d/b/a/ Mayo
Health System, d/b/a/ Mayo Clinic Health System
d/b/a Albert Lea Medical Center - Mayo
Health System, Mayo Clinic Health System-
Albert Lea, a corporation, Mayo Clinic, Inc.,
Mayo Foundation, Mark Ciota, M.D., John
Grzybowski, M.D., Dieter Heinz, M.D.,
Robert E. Nesse, M.D., Steve Underdahl, and
Stephen Waldhoff,

        Defendants.

---

## MEMORANDUM OF LAW IN SUPPORT OF THIRD AND SUPPLEMENTARY MOTION TO COMPEL DISCOVERY RESPONSES OVER PEER REVIEW OBJECTIONS AND FOR LEAVE TO TAKE ADDITIONAL DEPOSITIONS - SUPPLEMENTAL[1]

Plaintiff's Third and Supplementary Motion to Compel Discovery

Responses Overruling Peer Review Objections and for Leave to Take Additional

Depositions follows the Court's discovery Orders dated January 24, 2014 and

April 18, 2014.   This motion concerns claims of peer review privilege as to several

documents.

---

[1] Supplemented with citations to exhibits filed with Declaration of Richard T. Wylie on May 6, 2014, with the Court's permission.

## I.   ALLEGED PEER REVIEW DOCUMENTS DEFENDANT HAS WITHHELD SHOULD BE PRODUCED.

Defendant provided a privilege log on January 30, 2014.  Wylie Declaration, Exhibit A.  On March 3, 2014, Defendant produced a number of heavily redacted documents, claiming that they contain alleged peer review content and delivered a Third Amended and Supplemental Privilege Log.  Wylie Decl. Ex. B.  Some of the documents claimed to be privileged and heavily redacted have been discussed in depositions, and the privilege also asserted there by Defendant.

Plaintiff extensively briefed the peer review issue before Defendant was compelled to provide a privilege log, and his arguments remain applicable. However, it bears emphasis that the party claiming the privilege has the burden of proving that the privilege applies to the requested information. *Giusti v. Akron Gen. Med. Ctr.,* 2008-Ohio-4333, 178 Ohio App. 3d 53, 60-61, 896 N.E.2d 769, 775.  "A party claiming the peer-review privilege, at "a bare minimum," must show that a peer-review committee existed and that it actually investigated the incident." *Id*.

*Giusti* also held that:

- If the hospital were to establish that a qualifying peer-review committee investigated the particular incident, the next question is not be whether the privilege applies to some general category of communications among peers, but whether the privilege actually does

apply to each question the hospital's lawyer instructed his witness not to answer at deposition.

- "[I]nformation that may be of a type that usually makes up a peer review committee file is not protected by [state peer review statute] just because it usually makes up a peer review committee file."

- "not every inquiry made by a peer constitutes a peer review."

- "Therefore, a general objection that a line of deposition questions relates to a discussion among peers of the type usually had in preparation for a peer-review proceeding is not alone sufficient to gain the protection of the peer-review privilege."

*Id.*

Cases under the HCQIA, discussed below, have held that the "bare statement" by a hospital that its actions were grounded on quality healthcare concerns does not support a claim of immunity from damages under the statute. *Ahmed v. University Hospitals Health Care System*, 2002 WL 664026 (Ohio Ct. App. Apr. 8, 2002.) Also, a hospital did not meet the reasonable investigation standard for applying immunity where the "review" consisted of only three "chart reviews." *Brown v. Presbyterian Healthcare Services*, 101 F.3d 1324, 1334 (10th Cir. 1996).

Defendant has not supported its broad peer review objection with any factual predicate that a peer review committee existed and investigated what is at issue

here.  Below will be seen that the sole "peer review" investigator, Lori Routh, was not a physician, did not know what she was investigating, and only conducted "chart reviews,"  clearly engaging in activities not qualifying for peer review protection.

Plaintiff argued in his original motion to compel that there is no peer review privilege in this federal court action.  In federal question cases, federal common law controls the existence and application of evidentiary privileges. The Supreme Court has directed that although courts have the power to be flexible and adaptive with regard to the law of privilege, they should not use the power to recognize new privileges expansively. *See Univ. of Pa. v. EEOC,* 493 U.S. 182, 189, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990) ("We do not create and apply an evidentiary privilege unless it 'promotes sufficiently important interests to outweigh the need for probative evidence' " (citing *Trammel v. United States,* 445 U.S. 40, 51, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980))). Moreover, the Supreme Court has indicated that recognition of any privilege contravenes the "fundamental principle" that the public has a right to every person's evidence. *Trammel,* 445 U.S. at 50, 100 S.Ct. 906 (quoting *United States v. Bryan,* 339 U.S. 323, 331, 70 S.Ct. 724, 94 L.Ed. 884 (1950)).  *In re Admin. Subpoena Blue Cross Blue Shield of Massachusetts, Inc.,* 400 F. Supp. 2d 386, 389-90 (D. Mass. 2005).

The Health Care Quality Improvement Act of 1986, 42 U.S.C. §§ 11101–11152 ("HCQIA"), which governs actions in federal court, provides immunity from liability for damages in some cases involving peer review proceedings, but does not provide a peer review privilege.

> Just as Congress chose not to include a privilege for educational institutions in the Civil Rights Act, <u>Congress similarly chose not to include a medical peer review privilege in the Health Care Quality Improvement Act of 1986</u>, 42 U.S.C. §§ 11101–11152 ("HCQIA"). The Act was designed to provide "incentive and protection for physicians engaging in effective professional peer review." 42 U.S.C. § 11101(5) (2005). As such, Congress extended qualified immunity from suit to those conducting such peer reviews. 42 U.S.C. § 11111(a)(2) (2005). Significantly, Congress did not also create a federal evidentiary privilege for most documents produced during such a review, indicating that it "not only considered the importance of maintaining the confidentiality of the peer review process, but took the action it believed would best balance protecting such confidentiality with other important federal interests." *Teasdale v. Marin Gen. Hosp.,* 138 F.R.D. 691, 694 (N.D.Cal.1991). This Court must, especially in light of the **\*391** Supreme Court's language in *University of Pennsylvania*, consider it important that "Congress spoke loudly with its silence in not including a privilege against discovery of peer review materials in the HCQIA." *Id.; Nilavar,* 210 F.R.D. at 602 ("Congress, in enacting the HCQIA, carefully crafted a very specific privilege, applicable to peer review material submitted to the Secretary pursuant to the dictates of the mandatory reporting provisions of that statute. That is as far as Congress went, and that is as far as this Court should apply the privilege contained therein."); *Johnson v. Nyack Hosp.,* 169 F.R.D. 550, 560 (S.D.N.Y.1996).

*In re Admin. Subpoena*, 400 F. Supp. 2d 386, 390-91 (D. Mass. 2005).

For each withheld document that Plaintiff seeks, Plaintiff states why the document should be produced.  Plaintiff also requests that the Court review each document in question *in camera* before it grants peer review protection.  *State v.*

*Paradee,* 403 N.W.2d 640, 642 (Minn.1987): S*tate v. Jones*, 2009 WL 2997983 at

*5 (Minn. Ct. App. Sept. 22, 2009).

    A.    **Bates No. MAY0000163**, dated "January 2011,"  identified in

Defendant's privilege log as a "Peer review report by Lori Routh, dated January

2011, to Steve Underdahl, Mark Ciota and Tonia Lauer, regarding Plaintiff's

concerns of medical negligence, undertaken at direction of Steve Underdahl."

Wylie Decl. Ex. A.  This redacted document was produced on February 28, 2014,

both alone and as part of a document numbered as Bates No. MHS0005552- 5562,

discussed in ¶ B below.

    B.    **Bates No. MAYOOOO165**, dated 12/21/2010, identified in

Defendant's privilege log as "Portion of peer review report by Lori Routh [and

possibly Tonia Lauer] regarding Plaintiff's concerns of medical negligence and

fraudulent billing by doctors, with additional comments from Tonia Lauer,

undertaken at direction of Steve Underdahl," in January 2011.  Wylie Decl. Ex. A.

Because of its date shown in Defendant's privilege log, Plaintiff believes that this

document was produced as **Bates No. MHS0005552- 5562** on February 28, 2014,

after Mr. Underdahl's deposition, so Plaintiff could not question him about it.  This

document became Deposition Exhibit 86 during Lori Routh's deposition.  Wylie

Decl. Ex. P.  Routh Dep. at 101-102.  Wylie Decl. Ex. G.  The entirely redacted

pages 5556-5560 of Exhibit 86 are Ms. Routh's  "chart reviews and investigative

response."  Id. at 114.

This document should be produced entirely in unredacted form.  The

document includes a request for information pertaining to Plaintiff's "concerns"

about "fraudulent billing by doctors," not a subject for peer review protection.

Second, Defendant's description is also an acknowledgement that Plaintiff indeed

complained about this topic, which is relevant to his False Claims Act claim.

Third, the document also reflects an investigation of Plaintiff's complaints about

standards of medical care, which is a basis for his FCA and Minnesota state whistle

blower claims.

The document consists of a memorandum from Steve Underdahl to Lori

Routh and Tonia Lauer, dated December 21, 2010, requesting an investigation of

several complaints by Plaintiff containing heavily redacted portions at Bates Nos.

5552 [document represented by icon called "[patient name]," 5553 [documents

represented by icons called "patient name and "Investigation Response,]" 5554,

5555-5560.

Ms. Routh was directed not to testify about the document or her

investigation in her deposition and her conversations about the investigation on

peer review grounds.  Routh Dep. at 102,109, 110, 112, 113 (Wylie Decl. Ex. G.)

The only unredacted portion of the document is a statement that Plaintiff was somehow deficient in his prescription of IV Tylenol (an alleged reason for sustaining his termination).   Bates No. 5560.  This bullet point appears to be the final statement on page 5560, which is entitled, "Summary And Recommendation Of The Concerns Generated By Dr. Elkharwily."  That page, and no other, bears the date "January, 2011."  (Perhaps this is the document referred to in Defendant's privilege log as Bates MAY0000164, discussed in ¶ A above.)

The comment about Plaintiff and the IV Tylenol was gratuitous, which strongly suggests that this document was written more to circle the wagons to justify, after the fact, Plaintiff's removal, than be part of a legitimate peer review.

The investigation of Plaintiff's reports of Dr. Grzybowski not responding as an on-call doctor were not directed or handled by the Medical Executive Committee, and were not peer review.  Diane Clark, Physicians Services Administrator at MCHSAL, testified in her deposition on May 1, 2014, that investigations of patient care issues must be authorized and conducted by the Medical Executive Committee.  Clark was liaison to that Committee and attended its meetings.[2]  See also testimony of Mark Ciota, M.D..  At CEO Mark Ciota, M.D.'s deposition he testified that peer review matters were conducted by the Medical Executive Committee.  Dr. Ciota did not know if the MEC investigated

_____

[2] The transcript of Ms. Clark's deposition is not yet available.

Plaintiff's report about Dr. Grzybowski's not responding as an on-call doctor. Routh and Lauer were <u>not</u> on the MEC.  Ciota Dep. at 64-65.  (Wylie Decl. Ex. D.) He testified that peer review at MCHSAL must be conducted by physicians..  Id. at 68.  Further, a single person would not be assigned to conduct a peer review investigation.  Id. at 69.   Dr. Grzybowski did not know if Routh was qualified to investigate a doctor's medical care.  Grzybowski Dep. at 172-3 (Wylie Decl. Ex. E.) Whatever the purpose of  Routh's and Lauer's investigation (s) requested by Underdahl,  and whatever they did, it was not part of the peer review process at MCHSAL.

Routh claims that she did not understand or know what she was looking for or investigating regarding Plaintiff's complaint about Dr. Grzybowski.  She persisted that she only did "chart reviews" and was instructed not to answer what she was looking for or what a chart review entailed.  Rouse Dep. ¶ 102-114 (Wylie Decl. Ex. G.)   She had no clear idea what she was to do and her testimony was that Underdahl just told her to do a chart review.  Id. at 102.  She did not know if she was looking into an employment or patient care issue of  Dr. Grzybowski.  Id. at 109.  Employment problems were not peer review issues.  Ciota Dep. at 69 (Wylie Decl. Ex. D.)

Routh did not include Plaintiff in her so-called "peer review" investigation by asking him for information.  Routh Dep. at 106-107.  This was, she claimed,

because she did not have access to Plaintiff or have his phone number.  However, this is inconsistent with her testimony about attempts to reach Plaintiff on multiple phones including Plaintiff's personal cell phone when Plaintiff was allegedly being hard to reach.  Id. at 83-86.

After Plaintiff reported (for the second time) in November 2011 two incidents of patient care failure in in the form of the death of a post-surgical patient who was not anticoagulated and another patient who had pneumonia left unattended for 24-36 hours,  Routh was assigned to investigate the death by HR Director Fleegel (not the MEC).  According to Ms. Fleegel in her deposition, nurse (not doctor) Routh only performed "chart reviews" and determined nothing had gone wrong.[3]  Wylie Declaration, ¶ 5.  See, also Dep. Ex. 110 referring to the chart review. (Wylie Decl. Ex. V.)  She did not investigate in any manner the second patient.  Routh Dep. at 116 – 117.

Plaintiff's complaints about substandard patient care and patient harm were not reviewed as he made them.  See Underdahl Dep. at 92-93 (Wylie Decl. Ex. H); Heinz Dep. at 140-141 (Wylie Decl. Ex. F.)

Requiring unredacted production of this document would not discourage "frank peer review," because the document was prepared in connection with Plaintiff's complaints and on the occasion of Plaintiff's discharge.  See, *Pal v. New*

─────────────────────

[3] The transcript of Ms. Fleegel's deposition is not yet available.

*York University*, 2007 WL 4358463 at *7-*8 (S.D.N.Y. 2007).  Denying

production would "prevent [Plaintiff] from obtaining the very evidence needed to

prosecute" his claim statutory claims would "undermine [the FCA's, EMTALA's

and Minnesota's Whistleblower Act's] goal of encouraging whistle blowing by

medical personnel."  *Id*.

      In affirming Plaintiff's termination, Mayo HR Director Stackhouse wrote:

> You alleged that managements' decision was in retaliation for voicing
> concerns regarding patient care by other physicians.  The appeals committee
> was able to establish that the complaints were investigated, appropriately
> addressed, and were not the reason for seeking your resignation.

Stackhouse letter, 7/8/2011 (Wylie Decl. Ex. X.)  The investigation and addressing

of Plaintiff's acknowledged complaints was allegedly considered by the ad hoc

appeals committee.  It would be unfair to deprive Plaintiff access to all information

about that investigation.

      C.    **Bates No. MAYO000207**, described in Defendant's privilege log as

"Draft of letter from Dr. Grzybowski to MN Board of Medical Practice in response

to investigation triggered by Plaintiff." Wylie Decl. Ex. A.

      On the face of Defendant's description, this document was an unsent letter

by Dr. Gryzbowski in response to Plaintiff's complaint to the MN Board of

Medical Practice about, inter alia, his failure to respond as an on-call physician.

This document was not sent to an MCHSAL peer review committee, to the state, or

to anyone.  There is no peer review involved in the writing of a draft.  It should be

produced.

      D.    **Bates Nos. MAYO0006395 – 6462**, described in Defendant's

privilege log as "MHS Clinical Practice Committee Agenda Packet Contents

prepared for peer review meeting." The log states that the documents were attached

to an email and prepared or assembled on November 11, 2010, with the exception

of Bates 6412, which bears the date of October 20, 2010.

      In Defendant's latest amended and supplementary privilege log dated March

13, 2014, Defendant changes the description of several of the documents,

specifically Bates Nos. 6410, 6429, 6438, 6445, 6446, and 6459.  Wylie Decl. Ex.

A. They are made more specific than "packet contents."  Nevertheless, these

documents should be reviewed.

      These documents are relevant and responsive to Plaintiff's requests for

production.  For example, Request No. 13 sought:

      REQUEST NO. 13. All documents relating to reports and complaints,
including investigations of such reports and complaints and the results thereof,
made by Plaintiff to any person, both employees and non-employees of MCHSAL,
or any government or professional agency about any subject in any manner relating
to Defendant or any person who worked or practiced medicine at MCHSAL,
including, but not limited to, reports and complaints concerning billing, patient
care, and medical practices at MCHSAL, and/or actions taken against Plaintiff.

      Even if Bates Nos. MAYO 6395 – 6462 were related to a legitimate peer

review function, no documents among these pages that existed independent of the

peer review process are protected by the privilege. "Original documents and information are not privileged under the peer review law simply because the information was provided to or considered by a peer review organization. ". . . it is only documents originally created by the peer review organization that are truly off-limits." *Larson v. Wasemiller*, 738 N.W.2d 300, 315 (Minn. 2007). Therefore, Defendant should be required to identify those documents that existed independent of a peer review process and explain when and how any allegedly privileged document was created, and the Court should review the documents and identify those which existed separate from a peer review meeting. Those documents should be ordered produced.

**E.     Identifying what documents were filed in Defendant's "credentialing file" kept on Plaintiff.**

During her deposition on May 1, 2014, former Physicians Services Administrator Diane Clark testified that she maintained the credentialing files for doctors at the hospital. She also testified that other than documents that were a part of the normal  process for granting and renewing hospital privileges, only documents concerning physicians reflecting on patient safety were maintained in the credentialing file.[4]

_____

[4] The transcript of Ms. Clark's deposition is not yet available.

In her deposition on April 24, 2013, human resources director Monica Fleegel testified that certain documents related to Plaintiff's performance and termination were not in Plaintiff's personnel file, but in the credentialing file.[5]

The documents in question are found at Deposition Exhibits 22, 23, 25, and 40.  See, Wylie Decl. Ex. M.  Each of these documents contains allegations about Plaintiff that Defendant uses to justify Plaintiff's termination.  These documents do not exist in Plaintiff's personnel file.  Ms. Fleegel says they must be in Plaintiff's credentialing file.  Ms. Clark, who supervised the credentialing files, was instructed not to answer whether that was true.  If it is not, the implication is that the allegations about Plaintiff are not true.  This is the stuff of pretext.  Defendant should be directed to answer what documents are in Plaintiff's credentialing file.

### F.  Mortality Conferences Were Not the Setting for Peer Review.

Defendant's witnesses refused to testify about issues involving patients reported by Plaintiff that were not treated in accordance with standards of medical care.

Dr. Grzybowski testified that mortality conferences were informal conferences. No records were kept of mortality conferences.  Grzybowski Dep. at 168 – 169 (Wylie Decl. Ex. E.) Dr. Grzybowski denied receiving complaints and did not investigate a long series of patient care concerns raised by Plaintiff,

---

[5] The transcript of Ms. Fleegel's deposition is not yet available.

including about a death Plaintiff complained to him about.  But he said if he were
told about it he would investigate.  Id. at 68, 101-105.  Dr. Grzybowski stated that
he never chaired a peer review committee:  "No peer review committees did I
chair."  Id. at 100.  And, Dr. Heinz also denied investigating those specific patients
or ever looking into their death.  Heinz Dep. at 144 (Wylie Decl. Ex. F.)   Thus
Plaintiff's reports or complaint before, during or after a "mortality conference" are
not protected by the peer review privilege.

Plaintiff stated in his Declaration filed herein on January 11, 2014:

> I attended two "mortality conferences"  at MCHSAL in the fall of
> 2010.  The first conference had to do with a nurse supervisor who withheld
> treatment from a patient and told nurse not to call the on-call doctor,
> leading to his death.  This conference was chaired by Dr. Grzybowski. The
> second mortality conference was about an error by a doctor who had not
> corrected a patient's hyperkalemia on time and continuing failure to hand
> off patients.  The second conference was chaired by Dr. Heinz.  In both
> cases, the meeting was conducted to conclude that no one had made any
> mistake, even though the mistakes were obvious.  There should be emails
> and records of these two mortality conferences.  I discussed these cases
> with Dr. John Grzybowski, Dr. Dieter Heinz, Ms. Lori Routh, Nurse Sharyl
> or Chery, Dr. Arvin Vocal, and Dr. David Popp.

Wylie Decl. Ex. W. at ¶ 5.

Because Plaintiff's records and recording of his conversation with Dr.
Grzybowski after the mortality conference were taken from his rental house, which
was the proof he reported it to Grzybowski  outside of the mortality conference, the
only remaining evidence that Plaintiff told Grzybowski and Routh knew about this
is the record of the mortality conference.. As both Dr. Grzybowski  and Lori Routh

denied investigating this case, Plaintiff's report to them, inside or outside the mortality conference, should be considered original information and not protected by peer review. This is because they both denied that Plaintiff reported and performing an investigation or looking into the matter as a peer review committee would do.

Plaintiff alleges that he reported to Dr. Heinz the death of a patient with high potassium, with no sign out from Dr. Vocal or the on call doctor. Plaintiff complained to Dr. Heinz about missing documents from relevant charts. He reported these matters during and outside a mortality conference. The only way Plaintiff can show his reports to Dr. Heinz and Lori Routh, who attended that conference, is to produce all mortality conference records and direct witnesses to answer questions concerning cases discussed by Plaintiff in the conferences.

## II.     PLAINTIFF SHOULD BE PERMITTED TO TAKE ADDITIONAL DEPOSITIONS.

Plaintiff has reasonably deposed the following nine persons:

1. Steve Underdahl, former Albert Lea Hospital Chief Administrative Officer, who was present when Plaintiff was placed on administrative leave on December 8, 2014, and also when Plaintiff was told to resign or be terminated on December 10, 2014.

2. Dieter Heinz, M.D., Plaintiff's supervisor according to Defendant, and who sat on the ad hoc committee reviewing Plaintiff's termination.

3. Mark Ciota, M.D., CEO of the Albert Lea Hospital.

4. Steve Waldhof, Chief Administrative Officer of the Albert Lea Hospital, who conducted the first review of Plaintiff's termination.

5. Lori Routh, Nurse Executive, who was present when Plaintiff was placed on administrative leave on December 8, 2011, and who allegedly investigated Plaintiff and Plaintiff's complaints about Dr. Gryzbowski before and after Plaintiff's termination.

6. Monica Fleegel, Albert Lea Hospital's HR Director, who was present when Plaintiff was terminated on December 10, 2011.

7. Diane Clark, Albert Lea Hospital's Physician Services Director, who was identified as a person who collected adverse information about Plaintiff.

8. Greg Warner, former Director of Compliance for all of Mayo Clinic, to whom Plaintiff reported violations of standards of medical care, fraudulent admissions and EMTALA violations soon after his termination, along with his reports to Robert Nesse, M.D., CEO of Mayo Health System.

9. John Grzybowski, M.D., Medical Director, one of the doctors Plaintiff complained about failing to respond as an on-call physician (EMTALA violation) on December 8, 2010, and to whom Plaintiff claims he complained about medical standards violations and fraudulent admissions.

In addition , the deposition of Plaintiff's coworker, David Popp, M.D., an internal medicine doctor, is scheduled for May 12, 2014.  This will be the tenth deposition taken by Plaintiff.

Plaintiff requests permission to take the following additional depositions:

o Steve Underdahl, concerning Deposition Exhibit 89, notes of a meeting or conversation on December 8, 2010, and Deposition Exhibit 86, the witness' request for an investigation into Plaintiff's reports of Drs. Grzybowski and Boyce's failure to respond as on-call physicians, medical standards violations and fraud.

o A person(s) to be identified pursuant to FRCP, Rule 30(b)(6) to answer questions concerning Exhibit 49, how the documents came to be produced, who supplied if for document production, and the meeting or conversation on December 8, 2010.

o Robert Nesse, M.D.

o Stephanie Low

o Ramona Anderson

o Sandra Birchem, D.O.

o Leonard Shellhamer, M.D.

- Tyson Stackhouse, HR Director of Mayo Clinic, who managed the ad hoc committee reviewing Plaintiff's termination.

- Members of the ad hoc committee reviewing Plaintiff's termination – Karen Gosen, M.D., Tom Howell, M.D. and Marianne Mauer.

- Kevin Nelson

- Amy Boyer

- Arvid Vocal, M.D.

The reasons why Plaintiff needs to take these depositions are as follows:

A.     **Steve Underdahl**.  Plaintiff deposed Mr. Underdahl on January 21, 2014.  However, Defendant belatedly produced documents after the deposition, depriving Plaintiff of the opportunity to question him about them.  Noteworthy are Deposition Exhibits 86 and 89.  See, Wylie Decl. Ex. P and R.

Exhibit 86 is a request from Mr. Underdahl to Lori Routh and Tonia Lauer to investigate Plaintiff's claims about medical practices, what were EMTALA violations by Drs. Boyce and Grzybowski, and fraud.  Defendant has raised a disputed peer review objection to looking at the results or process of the investigation.  Plaintiff did not have Exhibit 89 when he deposed Mr. Underdahl.  Mr. Underdahl's purpose in requesting the investigation may help determine whether the resulting investigation was a legitimate peer review event concerning

the treatment of patients, or was to look into the behavior of Dr. Grzybowski and

Boyce.

Exhibit 89 contain notes dated 12/8/10, the day Plaintiff was placed on

administrative leave after questioning Dr. Grzybowski about his failure to come

when called to the hospital.  The names on the top of the notes are "Lori, Diane,

Steve U." The notes reflect removing Plaintiff from practice and placing him on

administrative leave and then reflect that there is no 90 day evaluation period in

Plaintiff's contract and that the hospital should employ reasons of a contractual 60

day notice to "dovetail with issues."  The starred language of the note lists the

issues apparently to be "dovetailed":  "Unavailability by phone – multiple

unorthodox procedures, tie together with quality and safety of patients care."

Lori Routh denies writing the note or attending a meeting such as is reflected

in the note.  Routh Dep. at 133-134 (Wylie Decl. Ex. G.)  Diane Clark also denied

in her deposition on May 1, 2014, that she wrote the note or attended such a

meeting.  This obviously leaves Mr. Underdahl as the likely author.

The note is timely evidence that reasons for terminating Plaintiff  were being

concocted on the day he was placed on administrative leave, illustrated by the

testimony of Dr. Gryzbowski.   Dr. Grzybowski specifically denied that he was

aware of any "unorthodox procedures" employed by Plaintiff.   Grzybowski Dep.

at 28-29 (Wylie Decl. Ex. E.)

Q  First of all, did you ever observe anything about Dr. Elkharwily's practice or treatment of patients that was unorthodox in your view?
**MR. SCHULTZ:** Same objection.
**THE WITNESS:** I did not have any concerns about his medical practice.

Nor was Plaintiff's termination a result of any patient safety or patient care issues, according to Dr. Grzybowski:

Q.  In your opinion, did any of the reasons why Dr. Elkharwily was asked to resign, or did any of those reasons implicate patient safety or patient care?
A.  No.

Id. at 38.

It is fair and necessary to depose Mr. Underdahl about his request for an investigation and the December 8, 2010, note and meeting.

In the alternative, if Mr. Underdahl proves not to have authored the note in Exhibit 89, Defendant should be ordered to identify a person(s) pursuant to FRCP, Rule 30(b)(6) to answer questions concerning Exhibit 89, how the document came to be produced, who supplied it for document production, and to testify about the meeting or conversation on December 8, 2010.

B.     **Robert Nesse, M.D.**  Dr. Nesse is the CEO of Mayo Health System. Plaintiff talked to and corresponded with him about his termination.

Defendant refused to produce Dr. Nesse, stating, " we do not understand how Dr. Nesse's deposition testimony is relevant. Dr. Nesse had no role in Plaintiff's employment or termination, and Plaintiff did not even contact Dr. Nesse until February 2011, after his termination. See, letter, 4/14/2014 (Wylie Decl. Ex.Y.)

To the contrary, Dr. Nesse had a significant role in Plaintiff's termination and its review.

Dr. Ciota testified that he didn't talk to Dr. Nesse about Plaintiff . Ciota Dep. at 75 (Wylie Decl. Ex. D.)  Mr. Waldhof, Chief Administrative Officer at Albert Lea, testified that he had not spoken to Dr. Nesse about Plaintiff.  Waldhof Dep. at 34 (Wylie Decl. Ex. I.)  However, Dr. Nesse wrote on January 25, 2011, that he talked to Dr. Cioti (sic) and that Plaintiff's termination was justified and well documented.  Wylie Decl. Ex. AA.  Dr. Nesse also wrote he "discussed . . .the difficult issues faced by [Plaintiff] shortly after he began his work as a hospitalist at … Albert Lea."  Id.   He wrote earlier to Mr. Stackhouse  that he was "aware of the issues."  Email, 1/7/2011, Bates 00000608 (Wylie Decl. Ex. ___.)  (See also attached email sent by Plaintiff to Dr. Nesse dated Feb 14,2011 (Bates 3840) questioning his information and its sources, which email was forwarded to virtually all MCHS administrators. What were these issues and how did he know them?

On February 7, 2011, Plaintiff sent emails to Dr. Nesse enclosing his January 4, 2011, letter to Dr. Noseworthy, Mayo Clinic CEO, recounting his complaints about medical practices and cover up at Albert Lea.  Dep. Ex. 104-105 Wylie Decl. Ex. T.)

Dr. Nesse told Plaintiff  in February 2011 by telephone that his appeal and also any complaint Plaintiff had about retaliation by Dr. Grzybowski should be sent to him and Dr. Bunkers, head of the Mayo Health System Personnel Committee.  He repeated to Plaintiff that he reviewed the termination process himself with Albert Lea and was told it was fair and objective and that the termination was "justified."

On July 7, 2011, at 12/11 a.m., Plaintiff submitted his witness list for the ad hoc committee to question, including Dr. Nesse.  Wylie Decl. Ex. BB, at Bates 1340.

On July 7, 2011, at 8:23 a.m., Plaintiff complained to Dr. Nesse about continuous patient care failures and "cover ups."  Dep. Ex. 107 (Wylie Decl. Ex. U.)  Plaintiff had earlier complained to Dr. Noseworthy on January 3, 2011, about cover ups of failure to provide adequate medical care.   Dep. Ex. 103 (Wylie Decl. Ex. S.) Just one day later, on July 8**,** 2011, Mr. Stackhouse notified Plaintiff  that the ad hoc committee had affirmed the termination decision.  Wylie Decl. Ex. X. Dr. Nesse was the highest ranking official at Mayo Health System.  Moreover, Mr. Warner testified that all patient care complaints that Plaintiff complained about and substandard of care would be deferred to Nesse.  Dr. Nesse was the ultimate head of Mayo Health system and over saw the appeal process and who had the power to change decisions.  Waldhoff Dep. at 112 (Wylie Decl. Ex. I.)  Dr. Nesse directed

the personnel committee of Mayo Health System ()Dr. Bunkers) away from the

matter and not to meet with Plaintiff.  Email, 2/7/2011, Bates No. 4077-4078

(Wylie Decl. Ex. CC.)

On the day Plaintiff was sent the decision of the ad hoc committee, Dr.

Nesse wrote that "the HPSP program is perfect for this." Email 7/8/2011, Bates

No. 0005317 (Wylie Decl. Ex. DD.)  He also wrote that "I was in Albert Lea to

discuss this situation in detail last Friday."  Id.  What did he learn? What was

discussed and with whom?  These are relevant questions.

Defendant should not be heard to argue that Dr. Nesse's deposition is

unnecessary because Plaintiff's contact with him was after December 10, 2010,

when Plaintiff was told to resign.  The foregoing discussion shows that Dr. Nesse

is a valuable witness to reports of events occurring pre-December 10.

Furthermore, post termination retaliation is actionable in the Title VII

context. *Burlington Northern & Santa Fe Railway Co*., 548 U.S. 53, 67 (2006)

(Title VII anti-retaliation provision "extends beyond workplace related or

employment-related acts"); *Robinson v. Shell Oil Co*., 519 U.S. 337, 346 (1997).

Like Title VII, the FCA provides for reinstatement of a discharged whistleblower

plaintiff.

In *Georgandellis v. Holzer Clinic, Inc*., 2009 WL 1585772, S.D. Ohio 2009,

at *8, the court held with respect to the False Claims Act:   "It is apparent from the

[False Claims Act], however, that the defendant, to be liable, must have had an employment relationship with the plaintiff to be liable," [citing *Nguyen v. City of Cleveland,* 121 F.Supp.2d 643, 648 (N.D.Ohio 2000)] …. Nevertheless, it is still required that the defendant have been, <u>at least at some point in time</u>, an employer of the plaintiff. " *Id*.

Plaintiff's right to appeal was a "term or condition of his employment." Between December 10, 2010 and July 8, 2011, Plaintiff was exercising his right as an MCHSAL employee to appeal the request to resign. See, Ex. 88. (Wylie Decl., Ex. __. The request to resign could have been remanded or reversed by Mr. Waldhoff. Waldhof Dep. at 30-31 (Wylie Decl. Ex. I.) It could have been reversed by the ad hoc committee. Id. at 116. It could have been reversed by Dr. Nesse. Id. at 112.

**Stephanie Low**. This RN was involved in caring for the patient who Dr. Grzybowski, while being on-call, did not come to the hospital to see on December 8, 2010. Plaintiff testified that he asked Ms. Low to report Dr. Grzybowski's failure. Elkharwily Dep. at 12-13 (Wylie Decl. Ex. C.) Ms. Low wrote an email dated December 9, 2010, Dep. Ex. 86 at Bates 5561-5562, complaining about Dr. Gryzbowski. Wylie Decl. Ex. P. Plaintiff needs to confirm her authorship of the email, that Dr. Elkharwily asked her to register a complaint about Dr. Gryzbowski and whether she spoke about it to anyone else before writing the email.

**Tyson Stackhouse**, HR Director of Mayo Clinic, managed the ad hoc committee reviewing the request to Plaintiff to resign or be terminated.  One of the two ad hoc committee members who were deposed, Dieter Heinz, M.D., remembered little about the meeting of the committee, including when a vote was taken.  Heinz Dep. at 109-113 (Wylie Decl. Ex. F.)  The other committee member deposed, Diane Clark, could not recall anything about the meeting, including whether she even attended it.  What the committee considered and what they knew about Plaintiff's reports of medical care problems and fraudulent admissions and billing is important.  Mr. Stackhouse was in the midst of the committee process and should be deposed.

Plaintiff was not present when other witnesses testified or presented evidence.  He did, however, at Mr. Stackhouse's invitation submit multiple documents supporting his position that he had been retaliated against and proposing questions to be asked of his witnesses.  Wylie Decl. Ex. BB.  Dr. Heinz testified that he did not receive any materials after the hearing.  Heinz Dep. at 112-113 (Wylie Decl. Ex. F.)   Plaintiff should be permitted to inquire of Mr. Stackhouse what he did with Plaintiff's submissions, did he present them to the committee, and whether he talked with any witnesses.

**Karen Gosen, M.D., Tom Howell, M.D. and Marianne Mauer**.  These are other members of the ad hoc committee.  Their depositions should be permitted for

the reasons for deposing Mr. Stackhouse.  What did they hear from witnesses?

What evidence did they review? Did they see Plaintiff's submissions? Was there a

vote?  In addition, Dr. Gosen was reportedly involved all along in Plaintiff's career

at Albert Lea. See, Tyson Stackhouse email, Bates No. 5317 (Wylie Decl. Ex.

DD.)

**Ramona Anderson**, Utilization Director at MCHSAL.  Plaintiff reported a

number of medical standards violations to Ms. Anderson, including in writing.

See, e.g., Dep. Ex. 14 and 18 (Wylie Decl. Ex. K and L) and text messages on

September 15and December 7, 2010, at Wylie Decl. Ex. EE and FF .  Plaintiff

should be permitted to question her about what she did with Plaintiff's information

and what she knew about the allegations about Plaintiff allegedly supporting the

request to resign.

**Leonard Shellhamer, M.D**.  Dr. Shellhamer was a medical leader at the

hospital, a coworker of Plaintiff and he wrote a positive recommendation for

Plaintiff after he was asked to resign.  See, Dep. Ex. 67 (Wylie Decl. Ex. ___.)

Plaintiff also complained to him about medical standards violations.

**Jeffrey Lotts, M.D**. Dr. Lotts wrote a positive recommendation for Plaintiff.

Dr. Lotts was also involved in treating the patient for whom Dr. Grzybowski failed

to respond on December 8, 2010, and waiting for Dr. Grzybowski to appear.

**Sandra Birchem, D.O**.  Dr. Birchem was a coworker of Plaintiff and prepared a recommendation letter for him.  Id.   She was a doctor who called Plaintiff and was talking to him when Plaintiff was paged.  She was present on a number of occasions when Plaintiff  observed medical care problems.   She wrote to Plaintiff stating "I am your advocate."

**Jennifer Blachowski**.  She was the social worker in the hospital.  It was reported that she told Dr. Gryzbowski, who told Dr. Ciota, that the hospital should "get rid of Plaintiff before he kills someone."   See, Dep. Ex. 43 (Wylie Decl. Ex. N.)  Also, Plaintiff had discussions with her regarding fraudulent admissions, vulnerable adults.  These are important facts that Plaintiff should be permitted to inquire upon in a deposition.

**Amy Boyer.**  Ms. Boyer was Greg Warner's assistant in the Mayo Clinic Compliance Office.  She attended Plaintiff's meeting with Mr. Warner at which he lay out his complaints.  She was involved in investigating Plaintiff's reports of fraudulent admissions at Albert Lea hospital.  Mr. Warner testified on April 23, 2014, that he "would probably start with Amy Boyer" to learn what happened with the investigation of those reports.  Warner Dep. at 38, 41-2 (Wylie Decl. Ex. J.)  Mr. Warner also testified that Plaintiff made Ms.  Boyer afraid by "backing her into a corner."  Id. at 25-6.  Plaintiff should be permitted to depose Ms. Boyer on these matters.

**Kevin Nelson**.  Mr. Nelson was in the Albert Lea human resources department and conducted an investigation into Plaintiff's performance and termination for Mr. Waldhof, the CAO who initially reviewed the discharge. Correspondence refers to an "investigative file" and interviews (plural) that Mr. Nelson conducted and documents providing "details" of the allegations supporting Plaintiff's dismissal.  Waldhof Dep. at 43-47 (Wylie Decl. Ex. I.).  Plaintiff should be permitted to depose Mr. Nelson to determine what the "investigative file" included, what interviews Mr. Nelson conducted and what other documents supported Plaintiff's discharge.

**Arvid Vocal, M.D**.  Dr. Vocal was present when Plaintiff  signed out the patient to Dr. Grzybowski on December 7, 2010, but for whom Dr. Gryzbowski did not come as the on-call doctor.   Plaintiff asserts that he spoke with Dr. Vocal about questionable admissions and that Dr. Vocal told Plaintiff  to admit everyone the emergency room asks.  he said Administration covers him up because he does everything they said to do.

**Recruiters or medical directors of  Mayo Health System hospitals in La Crosse , Austin, Owatonna and Rochester**.  These are hospitals that Plaintiff contacted to find a job, where he met with initial interest and then silence.  Plaintiff was told that the silence followed conversations with the Medical Director of

Albert Lea.  Plaintiff requires these witnesses to show the extent to which

Defendant retaliated against him.

## CONCLUSION

For the reasons stated herein, the Court should overrule Defendant's peer

review objections and direct production of the requested documents and direct

answers to questions involving mortality conferences,  direct Defendant to identify

what documents were filed in its credentialing file maintained on Plaintiff and

permit Plaintiff to depose the additional witnesses he requests.

Dated: May 6, 2014.

/s Richard T. Wylie_____
Richard T. Wylie
222 South Ninth Street, Suite 1600
Minneapolis, MN 55402
612-337-9581
**ATTORNEY FOR PLAINTIFF**