UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Alaa Elkharwily, M.D., | Civil No. 12-3062 (DSD/JJK) |
| Plaintiff, | |
| v. | **PLAINTIFF'S OBJECTIONS TO ORDER OF MAGISTRATE JUDGE DATED MAY 19, 2014** |
| Mayo Holding Co., a corporation, et. al. | |
| Defendants. | |

These are Plaintiff's objections under Local Rule 72.2 to the Order of Magistrate Judge Jeffrey Keyes' dated June 2, 2014, denying that portion of Plaintiff's Third and Supplemental Motion to Compel and for Leave to Take Additional Depositions seeking alleged peer review documents relating to mortality conferences.

In this action, Plaintiff alleges that he was discharged by Mayo Clinic Health System – Albert Lea because he reported, complained about or tried to stop violations of the federal False Claims Act, EMTALA and the Minnesota Whistleblower Act.

## BACKGROUND

Among other documents, Plaintiff sought documents relating to two "mortality conferences" for which Plaintiff received invitations. See, Frohman Declaration Ex. 16 [Doc. 116-16.] These conferences related to patients about

whose treatment violated standards of care. Nothing was attached to the invitations and Defendant did not produce underlying documents relating to the mortality conference because it claimed that Plaintiff had not requested any such documents. David Schultz letter, 5/19/2014, ¶ 5. Wylie Decl. Ex. ___. This is not true. Plaintiff had requested in his Amended Request for Production of Documents (Set I):

> **REQUEST NO. 13**. All documents relating to reports and complaints, including investigations of such reports and complaints and the results thereof, made by Plaintiff to any person, both employees and non-employees of MCHSAL, or any government or professional agency about any subject in any manner relating to Defendant or any person who worked or practiced medicine at MCHSAL, including, but not limited to, reports and complaints concerning billing, patient care, and medical practices at MCHSAL, and/or actions taken against Plaintiff.

Further, Plaintiff stated in his Declaration filed herein on January 11, 2014:

> I attended two "mortality conferences" at MCHSAL in the fall of 2010. The first conference had to do with a nurse supervisor who withheld treatment from a patient and told nurse not to call the on-call doctor, leading to his death. This conference was chaired by Dr. Grzybowski. The second mortality conference was about an error by a doctor who had not corrected a patient's hyperkalemia on time and continuing failure to hand off patients. The second conference was chaired by Dr. Heinz. In both cases, the meeting was conducted to conclude that no one had made any mistake, even though the mistakes were obvious. There should be emails and records of these two mortality conferences. I discussed these cases with Dr. John Grzybowski, Dr. Dieter Heinz, Ms. Lori Routh, Nurse Sharyl or Chery, Dr. Arvin Vocal, and Dr. David Popp.

Wylie Decl., 5/6/2014, Ex. W. at ¶ 5.[Doc. 109-10]

Plaintiff also requested in his Second Amended RFP, No. 1.F. and 1.S. the files of the patient who was the subject of the notice of morality conference sent on November 8, 2010. (Frohman Decl. Ex. 16):

> **REQUEST NO. 1.** All files and records relating to the care and treatment of the following listed patients at MCHSAL, including documents, communications and emails not maintained in the patient's official medical records. This Request is identical to Request for Production No. 9 in Plaintiff's Amended Request for Production – Set I, except for those parts of this Request that are stated but stricken through to clarify what is not requested, and except that this request does not request billing records, based on comments of the Magistrate Judge at the hearing on Plaintiff's motion to compel suggesting that a request for billing records was "overbroad" and that Plaintiff's Requests that the court
>
> * * * *
>
> 1.F. The patient described in ¶ 11. i of the Second Amended Complaint, who may also have been the grandmother of a respiratory tech at MCHSAL.
> * * * *
>
> 1.S. All files and records relating to the care and treatment of the patient referred to in ¶ 11.S. of the Second Amended Complaint, including documents, communications and emails not maintained in the patient's official medical records. This patient died and was a subject of a mortality conference on or about November 4 or 5, 2010. This request is new.

At the hearing on Plaintiff's motion on May 19, 2014, the Magistrate Judge directed that as to compel alleged peer review documents: "The Court defers ruling on the remainder of Plaintiffs motion to compel documents so that it can review the documents at issue in camera. An Order will follow after the Courts in camera review that will rule on the remainder of Plaintiffs motion." [Doc. 118.]

3

By Order, 6/2/2014, at 8-90 [Doc. 121] the Magistrate Judge ruled with respect to claimed peer review documents relating to two mortality conferences:

**Documents Relating to Certain Mortality Conferences**

Regarding Plaintiff's request for documents relating to "mortality conferences," the motion is **DENIED**. The documents are protected by the peer review privilege. Defendants shall immediately add the documents at issue that were not produced to Defendants' privilege log. With respect to the documents relating to the second mortality conference that Defendants no longer have access to, Defendants shall provide to Plaintiff the May 30, 2014 sworn Declaration of Beth L. Lacanne that explains the problem with the accessibility to the documents along with Defendants' updated privilege log.

See, Order, 6/2/2014 at 8-9. [Doc. 121.]

Defendant has provided a copy of the Declaration of Beth L. Lacanne, copy filed herewith as Wylie Declaration, Exhibit B. Defendant has not provided an updated privilege log.

Between the Magistrate's Orders on May 19 and June 2, 2014, Defendant apparently provided some documents for in camera review. With respect to documents related to the mortality conferences, all Plaintiff knows is that some unknown documents were produced and some were claimed to be corrupted and not retrievable. See, emails from Mr. Schultz and the Court (Wylie Decl. Ex. C; and LaCanne Declaration.

4

## ARGUMENT

The peer review privilege does not apply in this federal action. The Magistrate stated that the parties do not dispute that the Court has discretion to apply the peer review privilege to discovery in this case, under *Utech v. Bynum*, No. 07-4712 (DWF/RLE), 2008 WL 6582594, at *2–3 (D. Minn. Nov. 14, 2008) Order, 6/2/2014 at 2.   Plaintiff does not agree with *Utech*.  *Utech* is a case brought by patient's family against a hospital. This case is totally different.  This case is whistle blower case. The better view is represented by  Singh v. Pocono Med. Ctr., CIVA 3:09-0439, 2010 WL 2521039 (M.D. Pa. June 15, 2010), where the plaintiff bringing federal claims claimed that a peer review process was misused as part of a cover-up of wrongdoing.  The court refused to find a federal peer review privilege, relying on the fact that Congress has refused to establish a federal peer review privilege, and ordered production of materials covered by the state peer review statute..

Plaintiff argued in his original motion to compel that there is no peer review privilege in this federal court action.  In federal question cases, federal common law controls the existence and application of evidentiary privileges. The Supreme Court has directed that although courts have the power to be flexible and adaptive with regard to the law of privilege, they should not use the power to recognize new privileges expansively. *See Univ. of Pa. v. EEOC,* 493 U.S. 182, 189, 110 S.Ct.

577, 107 L.Ed.2d 571 (1990) ("We do not create and apply an evidentiary privilege unless it 'promotes sufficiently important interests to outweigh the need for probative evidence' " (citing *Trammel v. United States,* 445 U.S. 40, 51, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980))). Moreover, the Supreme Court has indicated that recognition of any privilege contravenes the "fundamental principle" that the public has a right to every person's evidence. *Trammel,* 445 U.S. at 50, 100 S.Ct. 906 (quoting *United States v. Bryan,* 339 U.S. 323, 331, 70 S.Ct. 724, 94 L.Ed. 884 (1950)). *In re Admin. Subpoena Blue Cross Blue Shield of Massachusetts, Inc.*, 400 F. Supp. 2d 386, 389-90 (D. Mass. 2005).

It has been held in a federal court action based on a state statute protecting persons who complain of substandard medical care, a federal court held that peer review information is discoverable. *Pal v. New York University*, 2007 WL 4358463 at *7-*8 (S.D.N.Y. 2007). The court noted that courts had required disclosure of incident reports or quality assurance committee data over peer review objections in federal civil rights cases. *Id*. at *6. Further, the court relied on two cases in which courts had compelled production of peer review information in non-malpractice, non-"civil rights" cases. *Id*. at *6-*8.

The *Pal* court ordered the requested discovery and concluded that the plaintiff's action was not brought to recover damages for medical malpractice, but to vindicate other rights, among which were rights been recognized by the New

York statute encouraging employees to reports hazards to their supervisors and to protect them from retaliation for making reports. *The court noted that the plaintiff was* not seeking "information regarding 'medical malpractice' or 'physician misconduct' to demonstrate that such malpractice or misconduct actually occurred," *but* to determine whether the employer's stated reasons for her discharge were pretextual; and that while disclosure could potentially lead to liability on a *whistleblower* claim, the peer review privilege is not intended to guard against this possibility. Id. at *7-8.

The Health Care Quality Improvement Act of 1986, 42 U.S.C. §§ 11101–11152 ("HCQIA"), which governs actions in federal court, provides immunity from liability for damages in some cases involving peer review proceedings, but does not provide a federal peer review privilege.

> Just as Congress chose not to include a privilege for educational institutions in the Civil Rights Act, <u>Congress similarly chose not to include a medical peer review privilege in the Health Care Quality Improvement Act of 1986</u>, 42 U.S.C. §§ 11101–11152 ("HCQIA"). The Act was designed to provide "incentive and protection for physicians engaging in effective professional peer review." 42 U.S.C. § 11101(5) (2005). As such, Congress extended qualified immunity from suit to those conducting such peer reviews. 42 U.S.C. § 11111(a)(2) (2005). Significantly, Congress did not also create a federal evidentiary privilege for most documents produced during such a review, indicating that it "not only considered the importance of maintaining the confidentiality of the peer review process, but took the action it believed would best balance protecting such confidentiality with other important federal interests." *Teasdale v. Marin Gen. Hosp.,* 138 F.R.D. 691, 694 (N.D.Cal.1991). This Court must, especially in light of the **\*391** Supreme Court's language in *University of Pennsylvania*, consider it important that

> "Congress spoke loudly with its silence in not including a privilege against discovery of peer review materials in the HCQIA." *Id.; Nilavar,* 210 F.R.D. at 602 ("Congress, in enacting the HCQIA, carefully crafted a very specific privilege, applicable to peer review material submitted to the Secretary pursuant to the dictates of the mandatory reporting provisions of that statute. That is as far as Congress went, and that is as far as this Court should apply the privilege contained therein."); *Johnson v. Nyack Hosp.,* 169 F.R.D. 550, 560 (S.D.N.Y.1996).

*In re Admin. Subpoena*, 400 F. Supp. 2d 386, 390-91 (D. Mass. 2005).

See, also, *Ahmed v. University Hospitals Health Care System*, 2002 WL 664026 (Ohio Ct. App. Apr. 8, 2002.) Also, a hospital did not meet the reasonable investigation standard for applying immunity where the "review" consisted of only three "chart reviews."

Even if the peer review privilege may be applied in the discretion of the court, bears emphasis that the party claiming the privilege has the burden of proving that the privilege applies to the requested information. *Giusti v. Akron Gen. Med. Ctr.,* 2008-Ohio-4333, 178 Ohio App. 3d 53, 60-61, 896 N.E.2d 769, 775. "A party claiming the peer-review privilege, at "a bare minimum," must show that a peer-review committee existed and that it actually investigated the incident." *Id*.

*Giusti* also held that:

- If the hospital were to establish that a qualifying peer-review committee investigated the particular incident, the next question is not be whether the privilege applies to some general category of

8

communications among peers, but whether the privilege actually does apply to each question the hospital's lawyer instructed his witness not to answer at deposition.

- "[I]nformation that may be of a type that usually makes up a peer review committee file is not protected by [state peer review statute] just because it usually makes up a peer review committee file."
- "not every inquiry made by a peer constitutes a peer review."
- "Therefore, a general objection that a line of deposition questions relates to a discussion among peers of the type usually had in preparation for a peer-review proceeding is not alone sufficient to gain the protection of the peer-review privilege." Id.

**At Defendant hospital, any physician could attend a mortality conference. Ciota Dep. at 68 (Wylie Decl. Ex. E.) At mortality conferences, no decisions were made; but at peer review meetings, decisions were made about whether a physician did something wrong. Id. at 69-70.**

**B.     Documents Relating to the Mortality Conferences Were Incorrectly Granted Peer Review Protection.**

Plaintiff does not know what Defendant provided for *in camera* inspection with respect to mortality conferences.

9

However, Plaintiff urged the Magistrate, and urges the District Court, to direct that Defendant supply the audio recordings of the meetings, the minutes and the patient files pertaining to the deceased patients who were the subject of the conferences. See, Wylie letter, 5/22/2014. Wylie Decl. Ex. D,

Plaintiff asserts that the conferences were used to cover up errors and illegalities, if not criminal violations, causing patient deaths. Where a "peer review process" is used for some other purpose than to "evaluate and improve the quality of health care and reduce mortality" (Minn. Stat. § 145.61, subdiv. 5.) it loses its peer review status. Thus, all records pertaining to the mortality conferences should be produced. Plaintiff proposes that two questions be answered:

> Is the privilege claimed by Defendant in the best interest of the public safety? The answer is no, but to hide violations of standards of care leading to patient death?
>
> Does the privilege claimed by Defendant , if granted, protect the public from further injuries or harm, or improve patient safety or quality of care? The answer is also no. Defendants knew the problems, and successfully so far have hidden them. More patients unnecessarily died and were harmed due to the same reasons Plaintiff reported about the patients discussed the mortality conferences. For example, a patient died in Spring 2011, which plaintiff also reported as a violation of standards of care involving failure of hand off, and cover up of violations.

Please see Plaintiff's Declaration [Doc. 123] addressing the importance of medical errors and cover up in hospitals.

Moreover, there was no consistency in holding mortality conferences. For example , no mortality conference was held for a patient death in the spring of

2010 because patient was not anticoagulated and there was a lack of hand offs. A sham investigation (chart review) was done by Ms. Routh who was not a physician and only she read the chart and she found no fault, six months after the death.  This conflicts with the view of plaintiff and the attending physician for the patient,  Dr. David Popp.  Dr. Popp testified that no one asked him about the death and he denied being invited to a mortality conference.  Popp Depo. at 66-70 (Wylie Decl. Ex. G.)  There was no mortality conference held for this hospital death.

There  was not even a claimed chart review for the first two mortality conference at issue.

If so called mortality conference s are voluntary, inconsistent and no criteria for when to be held or even how its attendees are selected, then it is not a peer review and the purpose of granting any claimed peer review is defeated.

Also, the patient charts are independent, original documents, which are not protected by any version of a peer review privilege in the first place, and must be ordered produced for both mortality conferences. *Larson v. Wasemiller*, 738 N.W.2d 300, 315 (Minn. 2007).  Defendant cannot claim to be unable to find these patient charts.  It has produced the chart of the hypotension patient but not the chart of the high potassium patient.  They are not privileged and relate to the mortality conferences and should be produced.  And, this rule applies to original documents by whatever label may be applied to them; emails and their

attachments, reports and whenever they were created - before or after alleged real peer review proceeding.

Defendants have claimed no privilege for audio recordings or minutes of mortality conferences because they have not included them in their privilege log. So, these should be ordered produced.Moreover, Plaintiff believes that the Magistrate Judge abused his discretion in responding to Defendant's claim that documents relating to one of the mortality conferences were inaccessible.

First, the Declaration of Beth LaCanne, the Mayo paralegal, dated May 30, 2014, concerning an email and attachments allegedly inaccessible for *in camera* review, was not a forensic report as promised. There is no identification of the in-house experts who performed any work on the problem, nor the outside consultant with whom Defendant "informally consulted." Defendant's reason for not producing the documents should not be accepted.

` Second, in ¶ 9 of the LaCanne Declaration, Defendant claims it tracked the missing file to MCHSAL's "Safety Zone," but does not say what was in that safety zone report, nor even the date of the safety zone item concerning this patient. Although corruption of the email and attachment is suspicious, if Defendant was able to retrieve the header of the email which led to an entry in the Safety Zone, it should provide the Court and Plaintiff with the Safety Zone file, report or other information, even if the patient's name is not stated. In an unredacted document

produced by Defendant after the hearing on May 19, 2014, a concern was reported by Nurse Executive Routh about a medication order Plaintiff wrote.  See Bates No. MHS0005559 (Wylie Decl. Ex. F.)   Counsel represents that Plaintiff was not named in the Safety Zone report about the order incident.  However, Ms. Routh was apparently able to identify Plaintiff.  Surely, if Defendant can unearth a complaint about Plaintiff,  it can locate the safety zone report relating to the patient relevant to the missing email and attachments.   That report should be ordered produced.

      Third,  ¶ 8 of the LaCanne Declaration states that the only items in the departmental share servers are the directory and the email.  Since the email sender and recipient were identified, defendant should be directed to identify Alan Kimble and Tonia Lauer (not physicians) and directed to search of emails on Mr. Kimble's sent box and Tonia Lauer's email inbox and produce any of the missing email and attachments found there.  Alan Kimble is no known part of a peer review process or group.  What department was he in?  If he or anyone else was not qualified to participate in a so-called peer review meeting or process, then it is not a peer review communication or event.   And, correspondence between Alan Kimble and Tonia Lauer not occurring in a mortality conference cannot be peer review privileged . No one else from the mortality conference was copied on the email.  Moreover, no email or attachments were communicated to the personnel who

attended the mortality conferences. Plaintiff did not receive them although is attended both conferences. See, Elkharwily Declaration filed herewith.

The Magistrate Judge disregarded the testimony of Defendant's witnesses which minimized the significance of mortality conferences as a serious processes. Dr. Grzybowski testified that mortality conferences were informal conferences. No records were kept of mortality conferences. Grzybowski Dep. at 168 – 169 (Wylie Decl.. 5/6/2014, Ex. E.) He denied receiving complaints and did not investigate a long series of patient care concerns raised by Plaintiff, including about a death Plaintiff complained to him about. But he said if he were told about it he would investigate. Id. at 68, 101-105. Dr. Grzybowski stated that he never chaired a peer review committee: "No peer review committees did I chair." Id. at 100. And, Dr. Heinz also denied investigating those specific patients or ever looking into their death. Heinz Dep. at 144 (Wylie Decl., 5/6/2014, Ex. F.) Thus Plaintiff's reports or complaint before, during or after a "mortality conference" are not protected by the peer review privilege.

## CONCLUSION

Upon the foregoing, Plaintiff respectfully requests that the Order of the Magistrate Judge dated June 2, 2013, be reversed and amended to provide:

1. Direction to Defendant to produce the patient files not heretofore produced of those patients who were the subject of the mortality

conferences noticed by the documents contained in Frohman Declaration Exhibit 16 [Doc. 116-16].

2. Direction to Defendant to produce all other documents and things relating to the two mortality conferences, including but not by way of limitation, audio recordings, minutes, emails, attachments , Safety Zone entries, information from the email accounts of Alan Kimble and Tonia Lauer, and a forensic report concerning the inaccessibility of documents relating to one of the conferences.

Dated: June 16, 2014.

/s Richard T. Wylie
Richard T. Wylie
222 South Ninth Street, Suite 1600
Minneapolis, MN 55402
612-337-9581
**ATTORNEY FOR PLAINTIFF**