UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 12-3062(DSD/JJK)

Alaa E. Elkharwily, M.D.,

           Plaintiff,

v.                                                          **ORDER**

Mayo Holding Company, a corporation,
d/b/a Mayo Health System, d/b/a
Mayo Clinic Health System, d/b/a
Albert Lea Medical Center - Mayo
Health System, Mayo Clinic Health
System - Albert Lea, a corporation,
Mayo Foundation, Mark Ciota, M.D.,
John Grzybowski, M.D., Dieter
Heinz, M.D., Robert E. Nesse, M.D.,
Steve Underdahl, and Stephen Waldhoff,

           Defendants.


     Richard T. Wylie, Esq., 222 South Ninth Street, Suite
     1600, Minneapolis, MN 55402, counsel for plaintiff.

     David T. Schultz, Esq., Charles G. Frohman, Esq. and
     Maslon, Edelman, Borman & Brand, LLP, 90 South Seventh
     Street, Suite 3300, Minneapolis, MN 55402; Joanne L.
     Martin, Mayo Clinic, 200 First Street S.W., Rochester, MN
     55905, counsel for defendants.


     This matter is before the court upon the motions for summary

judgment and to exclude expert testimony by defendant Mayo Clinic

Health System - Albert Lea (MCHSAL).  Also before the court is

plaintiff Alaa Elkharwily's objections to the order of Magistrate

Judge Jeffrey J. Keyes denying his request for sanctions.  Based on

a review of the file, record, and proceedings herein, and for the

following reasons, the motion for summary judgment is granted, the

expert motion is denied as moot, and the objections are overruled.

**BACKGROUND**

This employment dispute arises out of the termination of Elkharwily by MCHSAL.  Elkharwily held a hospitalist position - his first post-residency job - at MCHSAL from September 7, 2010, through December 10, 2010.  Elkharwily Dep. Vol. I at 19:19-20:10, 83:24-85:1.  Elkharwily was MCHSAL's first full-time hospitalist.  Frohman Decl. Ex. 3, at 1; Heinz Dep. at 8:5-13.  Elkharwily's duties included providing "care from admission to discharge for patients referred from Family Medicine and Internal Medicine, unattached medical patients, and hospitalized patients of medical and surgical specialties."  Frohman Decl. Ex. 3, at 3.  Among other duties, Elkharwily was specifically charged with helping refine the "hand-off" process by which patients are released to the care of their primary providers or consultants "when hospitalization has ended, a transfer is required or care is being shifted to another physician."  Id.; see also id. Exs. 4-10.

Elkharwily reported directly to Dr. Dieter Heinz, chair of the division of medicine, and indirectly to an administrative team including Dr. Mark Ciota, CEO; Dr. John Grzybowski, medical director; Steve Underdahl, hospital administrator; and Lori Routh, nurse executive.  Heinz Dep. at 8:17-18; Grzybowski Dep. at 8:7-12, 9:6-15; Routh Dep. at 6:22-7:8; Underdahl Dep. at 9:21-10:3.  Elkharwily's employment was governed by a contract that contemplated sixty days' notice for termination without cause or

2

sixty days' pay in lieu of notice.   Stark Decl. Ex. A., ¶ 12.
Additionally, under MCHSAL policy, Elkharwily was on probationary
status during the first ninety days of his employment.[1]   See
Frohman Decl. Ex. 16.   The policy states that new employees will be
evaluated in writing before the ninetieth day of employment and
that the evaluation will include a recommendation as to whether
(1) the employee will be accepted for continued employment, (2) the
probationary period will extend for up to thirty additional days,
or (3) the employee will be terminated.   Id. at 1.

Elkharwily, who suffers from bipolar disorder, was also
required to participate in the State of Minnesota's Health
Professionals Services Program (HPSP) while employed at MCHSAL.
Frohman Decl. Exs. 19-20.   HPSP required Elkharwily to have a work-
site monitor who would supervise him and submit quarterly reports
assessing his work performance.   Id. Ex 20, at 1-2.   Ciota served
as Elkharwily's work-site monitor.   Id. Ex. 18.

In preparation for Elkharwily's ninety-day evaluation,
Underdahl gathered information from nursing supervisors,
physicians, and other staff.   Underdahl Dep. at 32:18-33:22, 36:1-
4.   Through that process, Underdahl identified the following areas
of concern: (1) Elkharwily had difficulty organizing and
prioritizing his work; (2) staff was unable to reach him at times;

---

[1]  Elkharwily denies that MCHSAL told him that he would be on
probationary status.   Elkharwily's knowledge of his probationary
status is immaterial.

3

(3) emergency room physicians found him adversarial, resistant to admitting patients, and perceived that he unnecessarily generated work for the emergency department; (4) nursing staff did not trust his instructions or his interpretation of events; (5) he incorrectly told nursing staff that he could only care for twelve patients at any given time; and (6) he did not complete documentation in a timely manner. Frohman Decl. Ex. 15, at 1-2.

On November 29, 2010, Underdahl drafted the review, which set forth the above-stated concerns and extended Elkharwily's probationary status for an additional ninety days. Id. The report also noted that staff members who had early praise for Elkharwily had "begun to sound much more pessimistic" about his performance. Id. at 2.

While Underdahl prepared Elkharwily's evaluation, Ciota - with the help of physician services coordinator Diane Clark - independently prepared the HPSP report. Clark Dep. at 47:6-48:22, 50:1-9, 51:3-24. Clark solicited information from nurse supervisors and compiled the responses in a confidential report. See Frohman Decl. Ex. 22. The information received was similar to that gleaned during the performance evaluation. Specifically, staff reported that Elkharwily (1) was sometimes difficult to locate; (2) did not manage his time well and was disorganized; (3) was difficult to work with regarding end-of-life care; (4) became easily frustrated; and (5) did not communicate orders

effectively to nursing staff.  <u>Id.</u> at 2-3.  Ciota sent the report
to the State of Minnesota on December 6, 2010.  <u>Id.</u> at 1.

Underdahl planned to discuss the performance evaluation with
Elkharwily along with his supervisor Heinz, when Heinz returned
from out of town.  Underdahl Dep. at 32:8-17.  On December 7, 2010,
before that meeting could take place, Elkharwily ordered nurse
Brooke Thiele to give a patient IV Tylenol.  Frohman Decl. Ex. 23.
Unfamiliar with that form of Tylenol, Thiele questioned the order
and Elkharwily confirmed that he wanted IV Tylenol administered.
<u>Id.</u>  Thiele then asked whether Tylenol came in IV form.  <u>Id.</u>
Elkharwily responded that IV Tylenol was available because he
recalled giving it to a patient two days prior.  <u>Id.</u>  Thiele then
contacted the hospital pharmacy.  <u>Id.</u>  The pharmacist confirmed
that the hospital formulary did not carry IV Tylenol.[2]  <u>Id.</u>  When
presented with that information, Elkharwily told Thiele to give the
patient Tylenol via NG tube.  <u>Id.</u>

On December 8, 2010, Thiele reported the Tylenol incident to
the Nurse Executive, Lori Routh, who in turn reported it to
Underdahl.  Routh Dep. at 46:1-48:7.  Routh and Underdahl then
discussed the incident with Elkharwily.  <u>Id.</u> at 48:14-50:8;
Elkharwily Dep. Vol. I at 61:18-62:18.  Elkharwily insisted that IV
Tylenol was available and maintained that he had given it to a

_____

    [2]  IV Tylenol was newly approved by the FDA at that time, but
was not yet available at MCHSAL.  <u>See</u> Underdahl Dep. at 111:4-14.

patient just days before.  Routh Dep. at 51:7-52:5; Underdahl Dep. at 111:2-7, 112:7-15.  When Underdahl told Elkharwily that the medication was not available in the formulary, Elkharwily immediately changed his story by saying that he believed that IV Tylenol would have been a good choice had it been available. Underdahl Dep. at 112:15-25.  Elkharwily admits that he ordered IV Tylenol and that he believed he had given that medication to a patient a few days before, but he denies that the incident was significant.  Elkharwily Dep. Vol. I at 53:24-56:4, 61:3-8.

Concerned with Elkharwily's response, MCHSAL placed him on paid administrative leave until it could fully investigate the incident.  Underdahl Dep. at 118:22-119:4.  MCHSAL was specifically concerned about patient safety and Elkharwily's reliability, which was already in question given the comments elicited during the evaluation process.  Id. at 116:5-10, 122:4-123:4; see also Frohman Decl. Exs. 15, 22.

Underdahl and Routh conducted nursing staff interviews on December 9, 2010, to assess Elkharwily's patient safety and care. Underdahl Dep. at 123:22-125:14; Routh Dep. at 65:11-19, 67:2-68:7. Comments derived from this process match those made in connection with the performance evaluation and HPSP report.  See Frohman Decl. Ex. 24.  On December 10, 2010, Underdahl sent a memorandum to Grzybowski cataloging the many concerns about Elkharwily.  Id. Ex. 25.  Underdahl concluded the memorandum by stating, "[b]ased on the

volume and magnitude of concerns about Dr. Elkharwily and his performance as a hospitalist, it appears that a majority of team members have lost confidence in his ability and are very pessimistic about his ability to improve." Id. at 4. The same day, the administrative team, in consultation with in-house counsel, recommended that Elkharwily's employment end and that he be offered the opportunity to resign in lieu of termination. Underdahl Dep. at 17:16-18:20. Ciota approved this course of action. Ciota Dep. at 39:2-4; 46:22-47:8.

Later that day, Grzybowski, Underdahl, and a human resources representative met with Elkharwily to communicate MCHSAL's decision. Elkharwily Dep. at 6:20-7:2. 68:17-21; see also Frohman Decl. Ex. 32. Elkharwily disagreed with the decision and its basis, but agreed to consider resignation. Engelstad Decl. Ex. A, at 5. Elkharwily announced his resignation on December 11, 2010. Frohman Decl. Ex. 33.

On December 14, 2010, apparently regretting his resignation, Elkharwily sent emails to Ciota challenging the basis for his termination and accusing Grzybowski of blackmailing and intimidating him. Id. Ex. 34, at 2. Elkharwily also accused Grzybowski and others of "malpractice, [f]raud and unprofessional misconduct." Id. at 3. He further stated that he was subject to a hostile work environment and that he had complained to MCHSAL "over and over again." Id.

Elkharwily claims that he verbally reported patient safety concerns and negligence for months before being placed on administrative leave, but provides only vague, rambling details regarding the content of the alleged reports and when and to whom they were made.  See, e.g., Elkharwily Dep. Vol. I at 32:8-33:25; id. Vol. II at 94:21-99:25.  Elkharwily also claims that he submitted the following written reports of negligence and fraud to MCHSAL.

First, on September 15, 2010, Elkharwily sent a text to Ramona Anderson, the utilization review manager, mentioning a patient "with alcoholic intoxication and no thiamine or bana [sic] bag given" and stating "I think something was clearly wrong with the admissions from the E[R] today."  Frohman Decl. Ex. 62, at 2. Anderson simply responded, "OK good to know thanks."  Id.  In his deposition, Elkharwily testified in more detail about his text, explaining that he believed another doctor had engaged in "criminal negligence" in failing to admit the patient, who was having a heart attack.  See Elkharwily Dep. Vol. II at 75:25-76:10, 87:10-88:8. Despite describing the incident as "shocking and terrifying," Elkharwily admits that he did not immediately report it to Heinz, Ciota, Grzybowski, or Underdahl.[3]   Id. at 86:1-23; 88:6-8. Elkharwily claims that he verbally reported the incident to Ciota,

---

[3]   Elkharwily reported his concerns to Anderson and a nurse supervisor, neither of whom were his supervisor or decision-makers with respect to his employment.

Grzybowski, and Underdahl approximately one week later, but no document substantiates this claim.  See id. at 90:22-91:7. Further, Elkharwily's own seven-page discharge summary for the patient fails to mention any irregularity in the patient's care and belies his claim that the patient was not admitted.  See Frohman Decl. Ex. 37.

On September 20, 2010, Elkharwily sent an email to Anderson, Dr. Sandra Birchem, and Clark, noting that two patients needed to be transferred to the Rochester facility over the weekend because the hospital did not have the resources to handle their surgeries. Id. Ex. 38, at 1.  Elkharwily stated that it was "a big loss in terms of [r]evenue."  Id.  Elkharwily did not indicate that either of the patients received poor care.  See id.  Elkharwily concluded the email by saying "our ER department needs serious attention! Some serious cases over the weekend were almost missed."  Id. at 2. Elkharwily did not provide any details regarding his last statement, nor is there evidence that he shared this information with his superiors or that he reported it to MCHSAL via any official reporting mechanism.

On October 11, 2010, Elkharwily sent an email to several people, including Heinz, Grzybowski, and Underdahl, discussing hand-off issues from the previous shift and recommending ways to improve the process going forward.  Id. Ex. 39, at 3.

On November 9, 2010, Elkharwily sent an email to Anderson and nurse Donna Henesteg setting forth examples of alleged communication issues in the ER. <u>Id.</u> Ex. 63. Elkharwily explained that the communication issues justified his practice of questioning ER doctors before they admitted patients. <u>Id.</u> at 2. Elkharwily expressly stated that his email was "not a complaint." <u>Id.</u>

On November 22, 2010, Elkharwily sent an email to Underdahl, Grzybowski, Heinz, Ciota, and others suggesting that the hospital establish an inpatient wound-care team. <u>Id.</u> Ex. 40. He explained that not having such a team was "a huge loss of revenue for the hospital." <u>Id.</u> Elkharwily claims that this email constituted a complaint that the hospital was engaging in fraudulent billing. Elkharwily Dep. Vo. I at 241:7-242:1.

Elkharwily also claims that he reported possible malpractice relating to the care of three patients between December 7 and 8, 2010. As to the first patient, L.H., Elkharwily alleges that there was an undue delay in admitting L.H. and that the on-call doctor, Dr. Cory Boyce, refused to treat L.H. <u>Id.</u> at 11:18-12:4. There is no record of Elkharwily complaining about L.H.'s treatment.[4] Moreover, medical records show that L.H. was evaluated soon after

_____

[4] Elkharwily sent an email to Anderson with the patient's name and nothing more. Frohman Decl. Ex. 64. He later explained that he called Anderson and complained about Boyce and she asked him to send her the patient's name. Elkharwily Dep. Vol. I at 21:23-22:25, 23:9-14. There is no evidence that Anderson reported his concerns to anyone.

arriving at the ER and admitted in a timely manner thereafter. Frohman Decl. Ex. 42, at 2-4.

Elkharwily alleges that Grzybowski, who was on call, refused to come in to treat the second patient, F.J., who was already admitted to the hospital. Elkharwily Dep. Vol. I at 15:17-16:5. Elkharwily now admits that Grzybowski was not needed because Elkharwily was caring for F.J. Id. at 47:23-49:1, 63:2-64:11. Further, there is no evidence in the record that anyone asked Grzybowski to come in and treat F.J. Indeed, as the hospitalist, Elkharwily was charged with caring for admitted hospital patients such as F.J. See Frohman Decl. Ex. 3, at 3.

The last incident involved B.C., a patient who arrived at the ER at 11:00 p.m. on December 7, 2010. See id. Ex. 44, at 8. Grzybowski was not at the hospital, but was on call. The ER doctor and nursing staff conferred with Grzybowski by telephone as B.C.'s condition deteriorated. See id. There is no evidence that anyone asked Grzybowski to come in to treat B.C. See id. at 6-7. Nor is there evidence that Grzybowski refused to treat B.C. Medical records show that B.C. was admitted the morning of December 8, and transferred to the Special Care Unit at 6:30 a.m. See id. at 6.

Elkharwily claims that he reported Grzybowski for failing to treat B.C. on the morning of December 8, after he was placed on administrative leave. Elkharwily Dep. Vo. I at 52:2-53:4. There are no documents to substantiate this claim. Elkharwily also

claims that he instructed nurse Stephanie Low to report Dr. Grzybowski for failure to treat B.C.  On December 9, Low sent an email to her supervisor complaining that Grzybowski should have come in sooner to see B.C.[5]  Christensen Decl. Ex. A.  Low did not indicate that she sent the email at Elkharwily's behest.  See id.; Christensen Decl. ¶ 9.  Low acknowledged that Grzybowski never refused to come in to see the patient and, in fact, disclosed that Grzybowski repeatedly told her that she should have asked him to come in sooner.  Id. Ex. A.

As to each claimed instance of fraud or malpractice, it is undisputed that Elkharwily did not document his concerns through any of the hospital's reporting mechanisms, including Safety Zone, which is available at each computer terminal in the hospital. Clark Dep. at 62:14-63:3.  Elkharwily also admits that he did not contact the compliance office, legal department, confidential compliance hotline, or any outside agency regarding any of his concerns before his termination.  Elkharwily Dep. Vol. I at 65:1-12, 172:9-174:5, 285:3-8; see Frohman Decl. Ex. 41, at 8-9, 18, 20, 25.

After Elkharwily resigned, he claimed that he had witnessed systemic fraud and malpractice and that he was terminated for reporting such misconduct.  Elkharwily appealed his termination to

---

[5]  Christensen did not read the email until December 10 and did not consider the matter urgent because the patient had been stabilized.  Christensen Decl. ¶ 4.

MCHSAL's chief administrative officer, Stephen Waldhoff.  Frohman

Decl. Exs. 45-46.  The appeal was denied.  Id. Ex. 47.  He then

appealed to an ad hoc committee, which also upheld the termination

decision.  Id. Exs. 48, 52.  Throughout the appeal process,

Elkharwily maintained that he had been the subject of retaliation

based on his reports of fraud and malpractice.  On December 6,

2012, Elkharwily filed suit, alleging violations of the False

Claims Act (FCA), Emergency Medical Treatment and Active Labor Act

(EMTALA), Minnesota Whistleblower Act (MWA), Minnesota Vulnerable

Adults Act (MVAA), breach of contract, intentional infliction of

emotional distress (IIED), and defamation.  On December 20, 2012,

defendants filed a motion to dismiss.  Thereafter, on February 1,

2013, Elkharwily filed a motion to amend the complaint.  The court

held oral argument on February 22, 2013, where it granted the

motion to amend and took the motion to dismiss under advisement.

See ECF Nos. 29-30.  The court ultimately dismissed Elkharwily's

claims for IIED, defamation, violations of the MVAA, and the

portion of the EMTALA claim based on allegations that Elkharwily

was terminated for refusing to transfer a patient.  See ECF No. 42,

at 14, 23-24.  The court also dismissed all individual and entity

defendants other than MCHSAL.  Id. at 23-24.  MCHSAL now moves for

summary judgment on the remaining claims.  Elkharwily moves for

additional discovery and objects to the magistrate judge's denial

of his motion for sanctions.

13

**DISCUSSION**

## I.   Rule 56(d)

Elkharwily first argues that MCHSAL's motion is premature
because he needs additional discovery to meaningfully respond.
Elkharwily specifically requests leave to take four more
depositions and also seeks the production of certain medical
records. "A party opposing summary judgment who believes that she
has not had an adequate opportunity to conduct discovery must seek
relief pursuant to Federal Rule of Civil Procedure 56[d], which
requires the filing of an affidavit with the trial court showing
what specific facts further discovery might unveil." Stanback v.
Best Diversified Prods., Inc., 180 F.3d 903, 911 (8th Cir. 1999)
(citation and internal quotation marks omitted).

As an initial matter, the court has already denied
Elkharwily's requests for the depositions and documents he now
seeks under Rule 56(d). See ECF Nos. 101, at 8-9, 141, at 6-7,
222. Having previously resolved the issues, the court will not
revisit them. Further, Elkharwily has not argued - nor can he -
that he has not been given an adequate opportunity to conduct
discovery. During the more than two years since this case was
filed, the parties have engaged in exhaustive discovery and
contentious and repeated non-dispositive motion practice. The time
for dealing with discovery issues has long passed. See ECF No. 49,
at 1-2 (setting the discovery deadline as March 1, 2014, and the

14

non-dispositive motion deadline as April 1, 2014).  Elkharwily has had ample opportunity to explore facts relevant to his case and has offered no legitimate reason to explain his failure to do so within the deadlines imposed by the scheduling order.  Finally, the facts Elkharwily hopes to elicit through additional discovery are tangential, at best, and would not yield a different result.  As a result, Elkharwily's request is baseless, and the court may properly consider summary judgment at this time.[6]

## II.  Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material only when its resolution affects the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine if the evidence is such that it could

---

[6]  Elkharwily also requests permission to move to reconsider the court's order striking his 51-page narrative affidavit, which he sought to incorporate by reference into his already over-length memorandum.  See ECF No. 223.  In making this request, Elkharwily fails to show the "compelling circumstances" required for a motion for reconsideration.  D. Minn. LR 7.1(j).  Elkharwily complains that his affidavit is necessary to respond to MCHSAL's motion, but the record is complete without the affidavit.  Among other evidence, the court has received Elkharwily's two-volume deposition transcript, in which he details his version of events.  An additional, lengthy affidavit is unnecessary and would not further assist the court.

cause a reasonable jury to return a verdict for either party.  Id. at 252.

On a motion for summary judgment, the court views all evidence and inferences in a light most favorable to the nonmoving party. Id. at 255.  The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings but must set forth specific facts sufficient to raise a genuine issue for trial.  Celotex, 477 U.S. at 324.  A party asserting that a genuine dispute exists — or cannot exist — about a material fact must cite "particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A).  If a plaintiff cannot support each essential element of a claim, the court must grant summary judgment because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial.  Celotex, 477 U.S. at 322–23.

## III.  False Claims Act

Elkharwily first alleges retaliatory discharge in violation of the FCA.  The FCA protects a whistleblower who is "discharged ... because of lawful acts done ... in furtherance of [a civil action for false claims]."  31 U.S.C. § 3730(h).  An FCA retaliation claim has four elements: "(1) the plaintiff was engaged in conduct protected by the FCA; (2) the plaintiff's employer knew that the plaintiff engaged in the protected activity; (3) the employer retaliated against the plaintiff; and (4) the retaliation was motivated solely by the plaintiff's protected activity."  Schuhardt

v. Wash. Univ., 390 F.3d 563, 566 (8th Cir. 2004) (citation omitted).

MCHSAL argues that Elkharwily has not established that (1) he engaged in protected conduct, (2) MCHSAL was aware of the alleged protected activity, or (3) his termination was motivated solely by the protected activity.  The court agrees.

### A.   Protected Activity

To establish protected activity, Elkharwily must show that (1) his conduct was in furtherance of an FCA action and (2) the conduct was aimed at matters that are calculated, or reasonably could lead, to a viable FCA action.  Schuhardt, 390 F.3d at 567. "An employee engages in protected activity where (1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is possibly committing fraud against the government." Id. (quoting Wilkins v. St. Louis Housing Auth., 314 F.3d 927, 933 (8th Cir. 2002)).

Elkharwily alleges conduct in violation of Medicare and Medicaid, including unnecessary emergency room and hospital admissions, improper wound-care coding, and the overbilling of patient contact time.  Such violations, if substantiated, could create viable causes of action under the FCA.  See U.S. ex rel. Quirk v. Madonna Towers, Inc., 278 F.3d 765, 768 (8th Cir. 2002) (noting that fraudulent Medicare billing can establish claim under

FCA).  Elkharwily has failed to establish that any such conduct
occurred, however, let alone that he made a report in furtherance
of an FCA action.

Turning first to the alleged billing fraud, which is the most
concrete aspect of Elkharwily's FCA claim, the record shows that
Elkharwily had no basis to conclude, even subjectively, that MCHSAL
was defrauding the government through its billing practices.
Elkharwily relies on unspecified billing codes he claims to have
seen on certain patient charts, but fails to explain why he
believes they were false.  Elkharwily Dep. Vol. I at 322:8-323:4.
Even if he saw questionable codes on a chart, he admits that he was
unaware of what was ultimately billed to Medicare.  <u>Id.</u> at 323:2-4.
Indeed, Elkharwily admits that he (1) never saw the billing records
for any patient, (2) did not know the billing codes were provided
to the billing department, (3) did not know what billing codes were
used to support charges submitted to Medicare, (4) did not see the
bills MCHSAL sent to Medicare for reimbursement, and (5) did not
see what reimbursement MCHSAL received from Medicare.  <u>Id.</u> at
179:10-182:19.  In other words, Elkharwily has no specific facts or
information on which to base his suspicion of billing fraud.  Under
these circumstances, Elkharwily lacks a good faith belief that
fraud occurred.  <u>See</u> <u>Green v. City of St. Louis</u>, 507 F.3d 662, 668
(8th Cir. 2007) (finding that plaintiff had no reason to believe
there was a false or fraudulent claim because he was unable to

"point to any case in which he even suspected that [defendant's] practice had led to a false statement"); see also Lang v. Nw. Univ., 472 F.3d 493, 494-95 (7th Cir. 2006)("[A]n employee ... who just imagines fraud but lacks proof, legitimately may be sacked.").

Elkharwily next claims that MCHSAL violated the FCA by improperly coding wound care. The record also fails to support this aspect of the claim. Elkharwily argues that his November 22, 2010, email reports "unlicensed service." Elkharwily's interpretation of the email is unreasonable. The email does not even hint at improper conduct or unlicensed activity. See Frohman Decl. Ex. 40. To the contrary, the email suggests ways in which MCHSAL could increase revenue. See id. Thus, it cannot fairly be read to have put MCHSAL on notice of a potential FCA action. This allegation is without any factual basis.

Elkharwily's vague claims of fraudulent hospital admissions and other unspecified FCA violations are similarly lacking. Elkharwily argues that he complained about hospital admissions at the termination meeting on December 10, but he provided no coherent explanation as to why certain admissions violated the FCA. See Engelstad Decl. Ex. A, at 12, 14-15. As a result, Elkharwily has failed to articulate an actionable FCA violation.

**B.   Knowledge of Protected Activity**

Even if the record supported Elkharwily's allegations of possible FCA violations, there is no evidence that MCHSAL was aware

19

that Elkharwily was engaged in protected activity. "[A]n employee has the burden of presenting enough evidence to demonstrate that the defendant was on notice that plaintiff was either taking action in furtherance of a private *qui tam* action or assisting in an FCA action brought by the government." Schuhardt, 390 F.3d at 568 (internal quotation and citation omitted). Here, such evidence is utterly lacking. Although internal complaints can suffice to support a finding of knowledge by the employer, see id., Elkharwily has pointed to no complaints that, even generously read, notified MCHSAL of activity taken in furtherance of an FCA claim. At most, Elkharwily's "reports" constitute generalized grievances falling far short of allegations of fraud against the government.[7]

## C.   Causation

Elkharwily argues that he was terminated in retaliation for reporting FCA violations. As noted, he must establish that MCHSAL's decision to end his employment was "motivated solely by [his] protected activity." Id. at 566. Elkharwily cannot meet this burden. Even assuming he made FCA-viable reports, there is no evidence that Elkharwily's termination was anything other than

---

[7] To the extent Elkharwily relies on post-termination events, his claim fails for the additional reason that FCA claims are limited to adverse treatment in the "terms and conditions of employment" and do not apply to allegations of post-termination retaliation. 31 U.S.C. § 3730(h)(1); see also Bechtel v. St. Joseph Med. Ctr., Inc., No. 10-3381, 2012 WL 1476079, at *9 (D. Md. Apr. 26, 2012) (collecting cases).

performance based.  The record is replete with consistent and repeated concerns about Elkharwily's performance in several key areas.  Even crediting his theory that his whistle-blowing played a role in his termination, it plainly was not the sole basis for MCHSAL's decision.  As a result, there is no causal connection between Elkharwily's reports of fraud and his termination.  Because Elkharwily has failed to establish the elements required to prove an FCA claim, MCHSAL is entitled to summary judgment.

## IV.  Emergency Treatment and Active Labor Act

Elkharwily next alleges that MCHSAL retaliated against him for reporting EMTALA violations.  EMTALA prohibits a hospital from taking adverse action against a hospital employee who reports a violation of its provisions.  42 U.S.C. § 1395dd(i). EMTALA was enacted to "address a distinct and rather narrow problem - the 'dumping' of uninsured, underinsured, or indigent patients by hospitals who did not want to treat them." Summers v. Baptist Med. Ctr. Arkadelphia, 91 F.3d 1132, 1136 (8th Cir. 1996).  Relief under EMTALA is properly limited to "instances of 'dumping,' or improper screening of patients for a discriminatory reason, or failure to screen at all, or screening a patient differently from other patients perceived to have the same condition."  Id. at 1139. EMTALA has been roundly rejected as a federal medical malpractice statute.  See id. at 1137 ("EMTALA is not a federal malpractice statute and it does not set a national emergency health care

standard; claims of misdiagnosis or inadequate treatment are left to the state malpractice arena.")

Courts examine EMTALA-retaliation claims under Title VII jurisprudence. See Ritten v. Lapeer Reg'l Med. Ctr., 611 F. Supp. 2d 696, 715-16 (E.D. Mich. 2009); Lopes v. Kapiolani Med. Ctr. for Women & Children, 410 F. Supp. 2d 939, 947 (D. Haw. 2005). Where, as here, no direct evidence of retaliation exists, the court applies the burden-shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Dirden v. Dep't of Hous. & Urban Dev., 86 F.3d 112, 114 (8th Cir. 1996) (Title VII analysis). To establish a prima facie case of retaliation, Elkharwily must show that "(1) he engaged in a protected activity; (2) an adverse employment action was taken against him; and (3) a causal connection exists between the two." Barker v. Mo. Dep't of Corr., 513 F.3d 831, 835 (8th Cir. 2008) (citation omitted). The burden then shifts to MCHSAL to provide a legitimate, non-discriminatory reason for the adverse action. Id. at 834. The burden then returns to Elkhawrily to show that MCHSAL's reason was pretext for retaliation. Id.

Elkharwily argues that Boyce and Grzybowski failed to treat two patients while on-call on December 7 and 8, respectively in violation of EMTALA. MCHSAL argues that EMTALA was not triggered because both patients were admitted and stabilized. See 42 U.S.C. § 1395dd(a)-(c). The court agrees. The evidence does not support

Elkharwily's allegation that either Boyce or Grzybowski refused to come to the hospital to treat the patients.   The record also establishes that both patients were admitted, stabilized, and treated at the hospital.   See Frohman Decl. Exs. 42, 44.   Under these circumstances, Elkharwily has no viable EMTALA claim.   See 42 C.F.R. § 489.24(a)(1)(ii)("If the hospital admits the individual as an inpatient for further treatment, the hospital's obligation ... ends.").   Elkharwily may quibble with the quality of the patients' care, but his concerns, even if well-founded, do not support an EMTALA claim.

Elkharwily also has not demonstrated that he timely reported the alleged EMTALA violations to any of the people involved in the decision to end his employment.   As a result, Elkharwily cannot establish a prima facie claim under EMTALA, and summary judgment is warranted.   Further, as discussed above, Elkharwily cannot show that MCHSAL's legitimate, non-discriminatory basis for ending his employment was pretext for retaliation.

## V.   Minnesota Whistleblower Act

Elkharwily next alleges that MCHSAL violated the MWA.   As above, the court analyzes MWA claims under the burden-shifting framework of McDonnell Douglas.   See Chial v. Sprint/United Mgmt. Co., 569 F.3d 850, 854 (8th Cir. 2009) (applying Minnesota law). To establish a prima facie case, a plaintiff must "demonstrate statutorily protected conduct by the employee, an adverse

employment action by the employer, and a causal connection between the two." <u>Gee v. Minn. State Colls. & Univs.</u>, 700 N.W.2d 548, 555 (Minn. Ct. App. 2005) (citation omitted). A whistleblower engages in protected conduct when he,

> in good faith, reports a [violation or suspected violation] of any federal or state law ... [or] reports a situation in which the quality of health care services provided by a health care facility, organization, or health care provider violates a standard established by federal or state law or a professionally recognized national clinical or ethical standard and potentially places the public at risk of harm.

Minn. Stat. § 181.932, subd. 1(1), (4).

For the reasons already stated, Elkharwily did not engage in protected conduct under either the FCA or EMTALA. To the extent Elkharwily relies on the alleged "criminal negligence" on September 15, 2010, his version of events is unsubstantiated and therefore insufficient to sustain his claim. See Pony Computer, Inc. v. Equus Computer Sys. of Mo., Inc., 162 F.3d 991, 997 (8th Cir. 1998)("Summary judgment is appropriate where there is no independent evidence, other than the petitioner's unsubstantiated allegations."). Elkharwily's reports regarding the hand-off process are similarly unavailing. Even assuming such reports constitute protected activity, MCHSAL was well-aware of the issue and, in fact, hired Elkharwily to help refine and improve the hand-off process. See Pederson v. Bio-Med. Applications of Minn., 992 F. Supp. 2d 934, 940 (D. Minn. 2014) (noting that liability under the MWA may exist despite the employer's prior knowledge when:

"(i) an employee reports the violation to an outside government official or law enforcement entity, or (ii) an employee reports the violation to her employer without knowledge that the employer already was aware of it").

Elkharwily also may not rely on his post-termination reports because "[r]eports made after his employment ended cannot form the basis for a[n] [MWA] claim." Anderson v. Graybar Elec. Co., No. 09-251, 2010 WL 2545508, at *9 (D. Minn. June 18, 2010). As a result, Elkharwily has failed to establish a prima facie claim under the MWA, and summary judgment is warranted.[8]

## VI.  Breach of Contract

In Minnesota, a breach of contract claim has three elements: "(1) the formation of a contract, (2) the performance of conditions precedent by the plaintiff, and (3) the breach of the contract by the defendant." Zinter v. Univ. of Minn., 799 N.W.2d 243, 245 (Minn. Ct. App. 2011) (citation and internal quotation marks omitted). Elkharwily alleges breach of contract based on unpaid work shifts.

MCHSAL submitted evidence that it issued checks to Elkharwily to cover all hours worked during his employment, and that Elkharwily has refused to accept and cash those checks. See Stark Decl. ¶¶ 9, 12. Elkharwily has conceded this claim by not

---

[8]  Elkharwily's inability to establish pretext is also fatal to this claim.

responding to that evidence.  <u>See</u> Pl.'s Mem. at 57.  As a result, summary judgment is warranted.

## VII.  Objection to Denial of Sanctions

Elkharwily objects to Magistrate Judge Jeffrey Keyes's determination that he is not entitled to sanctions, arguing that MCHSAL failed to obey the court's April 18, 2014, discovery order. <u>See</u> ECF No. 212, 213.  Magistrate Judge Keyes concluded that MCHSAL complied in all respects with the discovery order.  Elkharwily has presented no information to undermine that conclusion, nor has he established that the order is clearly erroneous or contrary to law in any respect.  <u>See</u> 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a); D. Minn. L.R. 72.2(a).  As a result, the court overrules Elkharwily's objections.


## CONCLUSION

Accordingly, based on the above, **IT IS HEREBY ORDERED** that:

1.  Defendant's motion for summary judgment [ECF No. 200] is granted;

2.  Defendant's motion to exclude expert testimony [ECF No. 193] is denied as moot;

3.  Plaintiff's objections to the order of Magistrate Judge Jeffrey Keyes's December 17, 2014, order [ECF No. 213], are overruled;

4.    Plaintiff's request for leave to file a motion to reconsider the court's January 6, 2015, order [ECF No. 232] is denied; and

5.    This matter is dismissed in its entirety with prejudice.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  February 5, 2015

s/David S. Doty
David S. Doty, Judge
United States District Court